STATE OF NORTH CAROLINA v. JAMES DONALD KING

No. 204A99

(Filed 8 June 2001)

## 1. Criminal Law— competency to stand trial—failure to conduct competency hearing

The trial court did not err in a capital first-degree murder prosecution by failing to conduct a competency hearing prior to defendant's trial, because: (1) neither defendant nor defense counsel questioned defendant's capacity to proceed at any time during the trial or capital sentencing proceeding, N.C.G.S. § 15A-1002(a); (2) prior to trial the trial court directly asked defense counsel whether there had been a competency screening in this case, and defense counsel stated there was never a determination that defendant was incompetent to stand trial nor did counsel thereafter request a competency hearing or make a motion; (3) defendant waived his statutory right to a competency hearing under N.C.G.S. § 15A-1002(b) by failing to assert that right; and (4) evidence of past treatment standing alone does not constitute substantial evidence before the trial court indicating that defendant lacked capacity to understand the nature and object of the proceedings against him.

## 2. Homicide— first-degree murder—short-form indictment—constitutional

The short-form indictment used to charge defendant with first-degree murder was constitutional even though it failed to allege all the elements of first-degree murder.

## 3. Jury— peremptory challenges—African-American prospective jurors—race-neutral explanations

The trial court did not err in a capital first-degree murder prosecution by overruling defendant's objection to the State's use of peremptory challenges to strike African-American prospective jurors, because: (1) the prosecutor presented an adequate race-neutral explanation for the removal of a prospective juror based on the juror's response that she had nothing in her background that would cause her to distrust the police when her father was allegedly fired from the police department over a drug matter; and (2) the prosecutor also presented an adequate race-neutral explanation for the removal of a prospective juror based on one

of several factors including her reaction when speaking about her uncle's murder.

### 4. Jury— voir dire—prospective juror—improper stake-out question

The trial court did not abuse its discretion by limiting defendant's questioning during voir dire of a prospective juror during a capital first-degree murder prosecution concerning what sentence the prospective juror would vote for if defendant was convicted of first-degree murder under a theory of premeditation and deliberation without evidence of an affirmative defense, because: (1) defendant was allowed to ask the prospective juror about his consideration of life as a possible sentence and whether the juror would automatically vote for the death penalty if defendant was convicted of first-degree murder; and (2) defendant's question was an improper attempt to stake-out the prospective juror.

### 5. Evidence— hearsay—handwritten portions of victim's diary—state of mind exception

The trial court did not err in a capital first-degree murder prosecution by allowing the State to introduce handwritten portions of the victim's diary into evidence under the state of mind exception of N.C.G.S. § 8C-1, Rule 803(3), because: (1) the victim's challenged statements about her frustration with defendant and her intent to end their marriage were statements indicating the victim's mental condition at the time the statements were made and were not merely a recitation of facts; (2) the victim's journal entries bear directly on the victim's relationship with defendant at the time the victim was killed; and (3) the challenged evidence relates directly to circumstances giving rise to a potential confrontation with the defendant.

### 6. Evidence— hearsay—out-of-court statements of witnesses—residual hearsay exception—adequate notice—trustworthy and reliable

The trial court did not err in a capital first-degree murder prosecution by allowing the State to introduce out-of-court statements of several witnesses to police officers under the residual hearsay exception of N.C.G.S. § 8C-1, Rule 804(b)(5), because: (1) all four of the declarants were unavailable at the time of trial since they had all died during the almost nine-year period that defendant remained a fugitive from the law; (2) two of the declarants made their statements on the day of the murder, the third

STATE v. KING

[353 N.C. 457 (2001)]

declarant made his statement the day after the murder, and the fourth declarant made his statement two days after the murder; (3) the prosecutor gave defendant sufficient notice to provide a fair opportunity to meet the evidence; and (4) the trial court addressed each of the challenged statements separately and found them to be trustworthy and reliable.

**7. Homicide— first-degree murder—failure to instruct on lesser-included offense of second-degree murder**

The trial court did not err in a capital first-degree murder prosecution by denying defendant's request to instruct the jury on the lesser-included offense of second-degree murder, because: (1) the State's uncontradicted evidence tends to show that defendant killed the victim with premeditation and deliberation; and (2) mere speculation by defendant that it was possible that a conflict erupted between defendant and the victim that resulted in her death based on his desire to reconcile with the victim is not sufficient to negate evidence of premeditation and deliberation.

**8. Sentencing— capital—mitigating circumstances—no significant history of prior criminal activity**

The trial court did not err in a capital first-degree murder prosecution by failing to submit the N.C.G.S. § 15A-2000(f)(1) mitigating circumstance of no significant history of prior criminal activity, because: (1) the State presented evidence that defendant had previously been convicted of the first-degree murder of his former wife and was sentenced to life imprisonment, but he was later paroled; and (2) the (f)(1) mitigating circumstance is not properly submitted in cases that involve a prior criminal history which includes a violent felony involving death.

**9. Sentencing— capital—jury question—unanimous recommendation for life sentence**

The trial court did not err in a capital first-degree murder prosecution by its response to the jury's question concerning whether a recommendation of a life sentence had to be unanimous, because: (1) the trial court properly informed the jury that its answers to issues one, three, and four must be unanimous; and (2) the trial court's additional instruction that the inability of jurors to reach a unanimous verdict should not be their concern but should simply be reported to the court, given at defendant's request before the jury began its deliberations, constituted invited error.

**10. Sentencing— capital—aggravating circumstances—violent felony—testimony and photographs from prior murder conviction**

The trial court did not abuse its discretion in a capital first-degree murder prosecution by allowing the State to introduce testimony and photographs dealing with defendant's prior murder conviction to support the N.C.G.S. § 15A-2000(e)(3) violent felony aggravating circumstance, because: (1) the Rules of Evidence do not apply to a capital sentencing proceeding, and thus the trial court has great discretion to admit any evidence relevant to sentencing; (2) the trial court reviewed the probative value of the evidence against unfair prejudice and denied admission of photographs that showed blood and brain matter throughout the murder scene and limited the testimony of the investigating officer; and (3) photographs of the murder weapon used by defendant, the condition of that victim's body, and the location of the body and the wound were relevant to establish the existence of a prior violent felony.

**11. Sentencing— capital—mitigating and aggravating circumstances—weight given to each**

Although defendant contends the trial court committed plain error in a capital first-degree murder prosecution by instructing the jury in a manner that allegedly allowed the jury to impose a death sentence by finding mitigating circumstances and aggravating circumstances of equal value, this argument has been repeatedly rejected and defendant has presented no compelling basis to revisit this issue.

**12. Sentencing— capital—death penalty not disproportionate**

The trial court did not err by imposing a sentence of death for a first-degree murder case, because: (1) defendant was convicted of first-degree murder on the basis of premeditation and deliberation; and (2) the jury found the N.C.G.S. § 15A-2000(e)(3) violent felony aggravating circumstance based on defendant's prior murder conviction for shooting and killing his first wife.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Morgan (Melzer A., Jr.), J., on 23 November 1998 in Superior Court, Guilford County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 18 April 2001.

**STATE v. KING**

[353 N.C. 457 (2001)]

*Roy A. Cooper, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*M. Gordon Widenhouse, Jr., for defendant-appellant.*

WAINWRIGHT, Justice.

On 4 August 1997, defendant was indicted for first-degree murder. Defendant was tried capitally before a jury at the 26 October 1998 Criminal Session of Superior Court, Guilford County. The jury found defendant guilty of first-degree murder on the basis of premeditation and deliberation. After a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder, and the trial court entered judgment in accordance with that recommendation. Defendant appeals his first-degree murder conviction and sentence of death to this Court.

The State's evidence at trial tended to show as follows: In the early morning hours of 11 September 1988, defendant shot and killed his wife, Gloria Underwood King (the victim), while she was walking home from playing bingo with friends. The victim received seven gunshot wounds, four of which were inflicted to her head. Several area residents heard the gunshots and saw the victim's body lying on a sidewalk in front of Jones Elementary School in Greensboro, North Carolina. However, no one was able to identify the gunman at the time of the shooting.

Greensboro police arrived at the scene at approximately 1:30 a.m. on 11 September 1988. The victim showed no signs of life. Officers observed a bingo marker on the ground near the victim's body.

An autopsy performed on the victim's body revealed that the victim received seven gunshot wounds. One bullet entered the right side of the victim's head, fracturing the skull and causing a subdural hematoma. A small-caliber bullet was removed from the skull in the area of this gunshot wound. A second bullet struck the victim in the same area, causing a small fracture to the skull. This bullet was also removed from the victim's skull. A third bullet, which was fired at close range, struck the victim near the right eyebrow and passed into the scalp. Bullet fragments were removed from the victim's scalp in the area of this injury. A fourth bullet struck the victim just below her right eye. A fifth bullet struck the victim on the back of her neck. Bullet fragments were removed from this wound. The amount of soot or stippling surrounding this wound indicated that the wound was

inflicted at very close range. Gunshot wound number six was located on the victim's right hand near the base of her second finger. The wound was surrounded by a small amount of powder, indicating a close-range gunshot. Finally, gunshot wound number seven was located at the base of the victim's right thumb and was described as a defensive wound. The bullet was recovered from the soft tissue of the victim's right hand. The testifying pathologist opined that the cause of death was a gunshot wound to the head.

On 15 September 1988, the police located defendant's vehicle in downtown Greensboro. The police later searched the vehicle and found, among other things, two .22-caliber bullets, an automobile insurance policy belonging to defendant, and a bottle of Thunderbird wine.

At trial, the victim's daughter, Erika Underwood, testified that defendant and the victim were married on 9 June 1986 and separated near the end of 1987. After the separation, defendant visited the victim approximately once a week. Underwood testified that, as a result of suffering a stroke, defendant walked with a very noticeable limp at the time the victim was killed. Sometime during the separation, the victim learned that defendant was seeing another woman, Betty James (Betty), and the victim visited Betty's apartment to confront her. During her testimony, Underwood read journal entries made by the victim during the days before she was killed. In her journal, the victim described the deterioration of the relationship between defendant and the victim, including the victim's knowledge of defendant's girlfriend, Betty. The victim described defendant as selfish, uncaring, untruthful, and stingy. She also wrote that she had no desire to reconcile with defendant.

Katie Chavis, a friend of the victim's, testified at trial that, in September 1988, defendant and the victim visited her, and defendant sat outside in his automobile. The victim wanted to borrow money from Chavis to go play bingo. During that visit, the victim told Chavis that she knew defendant "had a lady pregnant." The victim also stated that defendant told her if she left him, he was going to kill her, and that she was tired of living in fear. In a previous conversation, the victim told Chavis that defendant had beat her and forced her to have sex and that she was afraid. Chavis encouraged the victim to keep a diary that would serve as a "paper trail" regarding defendant's abusive conduct.

While investigating the victim's murder, the police learned that, on 6 September 1988, defendant visited his cousin, Herbert "Billy" Alston. Defendant told Alston that he wanted to get the victim to come back to him. Alston and defendant visited the victim's apartment, but she was not at home. Defendant and Alston then visited a woman, whose first name was also "Gloria," and asked her to go and talk to the victim about reconciling with defendant.

On 8 September 1988, defendant and Alston visited Gloria once again, and defendant asked her to take his car and go talk to the victim on his behalf about reconciling. At one point, defendant directed Alston to obtain the registration card from defendant's vehicle. When Alston looked over the sun visor for defendant's registration, he observed a .22-caliber revolver with no handle grips.

Alston also spent time with defendant on 10 September 1988, the day before the victim was killed. Defendant and Alston went to see defendant's girlfriend, Betty, and defendant asked her if she knew anyone from whom he could borrow a vehicle. Betty told defendant that she did not know of anyone who had a vehicle, and defendant and Alston returned to Alston's residence. Defendant stayed at Alston's house until approximately 11:30 p.m. on 10 September 1988, the night before the murder.

The police also spoke with Betty during the investigation. Betty dated defendant before his marriage to the victim and resumed her relationship with defendant after his separation from the victim in 1988. According to Betty, she learned that she was pregnant with defendant's child in August of 1988.

On 7 September 1988, defendant came to Betty's residence at approximately 6:00 p.m., carrying a handgun and ammunition. Betty described the gun as having no handle grips. Defendant told Betty he wanted to kill the victim with the gun. Defendant stated that he had to do it because the victim had hurt him too many times and would not talk to him. Defendant left later that evening to find out why the gun was not "shooting right." Defendant told Betty he had fired the weapon out in the country, and it did not work properly. Defendant returned at approximately 10:30 p.m., placed the gun in the night-stand drawer, and spent the night with Betty.

The next morning, on 8 September 1988, defendant once again told Betty that he was going to kill the victim. Betty convinced defendant not to go through with his plan. The next day, defendant

yet again spoke of killing the victim, and once again, Betty talked him out of it. Defendant did not stay with Betty that night. However, on 10 September 1988, defendant visited Betty and told her that she had kept him from killing the victim for two days but that she would not stop him anymore.

When the police visited Betty during the investigation, she gave them a trash bag that contained an unfired .22-caliber bullet and several envelopes addressed to defendant. Betty explained that defendant had left the bullet in her nightstand.

Shortly before the murder, defendant spoke with Mac Durham, an individual who previously served time in prison with defendant. During that conversation, defendant asked Durham, "[I]f you put a .22 against somebody's head, will you kill them?" Durham told defendant that it would kill the person because a .22-caliber gun is a deadly weapon.

During the investigation, the police located three women who played bingo with the victim shortly before she was murdered on 11 September 1988. Two of the women, Minnie Hayes and Verna Pennix, departed the bingo parlor with the victim at approximately 12:30 a.m. At that time, they observed defendant waiting outside for the victim. Defendant approached the victim, led her near the building by her arm, and began talking with her. According to Pennix, the victim acted fearful when she saw defendant. When Hayes and Pennix asked the victim whether she was leaving with them, she did not respond. However, defendant informed the women that he would take the victim home. The third woman, Loretha Foushee, exited the bingo parlor approximately ten minutes after the victim left the building. Foushee observed defendant talking with the victim up against the side of the bingo parlor and noted that defendant had his arms on either side of the victim, "boxing her in."

At trial, Special Agent Gerald F. Wilkes of the Federal Bureau of Investigation (FBI) testified as an expert in the field of firearms and ammunition examination. Agent Wilkes performed an examination of the bullets and bullet fragments that were recovered by the Greensboro Police Department during the investigation. Agent Wilkes determined that a spent round submitted to him, as well as the live rounds recovered during the investigation, were .22-caliber long-rifle bullets. According to Agent Wilkes, the live rounds he examined were similar in physical characteristics to the lead bullet projectile removed from the victim's wrist.

**STATE v. KING**

[353 N.C. 457 (2001)]

Kathleen M. Lundy, an examiner with the FBI Laboratory in Washington, D.C., also testified at trial. Lundy was tendered and accepted as an expert in the field of comparative bullet lead analysis. Lundy examined three live rounds and six bullet projectile fragments recovered by the Greensboro Police Department. In her expert opinion, the bullets and bullet fragments she examined, including a bullet from one of the live rounds she studied, were similar in composition such that they were manufactured from the same melting pot of lead. Ms. Lundy opined that, based on her lead analysis, the bullets she examined either came from the same box of cartridges or came from different boxes of the same caliber, manufactured at the same time.

On 13 June 1997, almost nine years after the victim was murdered, defendant was arrested in Dayton, Ohio. When law enforcement authorities first located defendant, he identified himself as Robert Robinson and possessed a photo identification card, a social security card, and a birth certificate under that name. Defendant also had a welfare identification card in the name of Peter Emerey.

## PRETRIAL ISSUES

[1] By assignment of error, defendant contends the trial court erred by failing to conduct a competency hearing prior to defendant's trial. We disagree.

N.C.G.S. § 15A-1002 governs the determination of a defendant's incapacity to proceed and provides in pertinent part:

(a) The question of the capacity of the defendant to proceed may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court. The motion shall detail the specific conduct that leads the moving party to question the defendant's capacity to proceed.

(b) When the capacity of the defendant to proceed is questioned, the court:

. . . .

(3) Must hold a hearing to determine the defendant's capacity to proceed. . . .

N.C.G.S. § 15A-1002(a), (b)(3) (1988) (amended 1989). Further, N.C.G.S. § 15A-1001 provides that a defendant suffers from an incapacity to proceed if "he is unable to understand the nature and object

of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner." N.C.G.S. § 15A-1001(a) (1999).

Pursuant to the plain language of section 15A-1002(b)(3), the trial court "[m]ust hold a hearing to determine the defendant's capacity to proceed" *if* the question is raised. However, this Court has recognized that " 'a defendant may waive the benefit of statutory or constitutional provisions by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it.' " *State v. Young*, 291 N.C. 562, 567, 231 S.E.2d 577, 580 (1977) (quoting *State v. Gaiten*, 277 N.C. 236, 239, 176 S.E.2d 778, 781 (1970)). Moreover, we have said that

> "in order for an appellant to assert a constitutional or statutory right in the appellate courts, the right must have been asserted and the issue raised before the trial court. Further, it must affirmatively appear on the record that the issue was passed upon by the trial court."

*Id.*, (quoting *State v. Parks*, 290 N.C. 748, 752, 228 S.E.2d 248, 250 (1976)).

In the present case, neither defendant nor defense counsel questioned defendant's capacity to proceed. The record reveals that, prior to trial, the trial court directly asked defense counsel whether there had been a competency screening in this case. The trial court informed defense counsel that "if there's some question about [defendant's] competency, then I want to hear whatever evidence is to be presented and make that determination before we go forward so that it's in the record."

In response, defense counsel informed the trial court that defendant had received treatment for depression in connection with a suicide attempt and that "there was never a determination that [defendant] was incompetent to stand trial." Defense counsel did not thereafter request a competency hearing or make a motion "detail[ing] the specific conduct that leads the moving party to question the defendant's capacity to proceed." N.C.G.S. § 15A-1002(a). Accordingly, defendant waived his statutory right to a competency hearing under N.C.G.S. § 15A-1002(b) by his failure to assert that right. *Young*, 291 N.C. at 567, 231 S.E.2d at 580.

We likewise reject defendant's argument that the trial court's failure to conduct a competency hearing violated his constitutional

rights. It is beyond question that a conviction cannot stand where the defendant lacks capacity to defend himself. *Drope v. Missouri*, 420 U.S. 162, 43 L. Ed. 2d 103 (1975); *State v. Heptinstall*, 309 N.C. 231, 236, 306 S.E.2d 109, 112 (1983); *Young*, 291 N.C. at 568, 231 S.E.2d at 581. Indeed, this Court has recognized that " '[a] trial court has a constitutional duty to institute, *sua sponte*, a competency hearing *if there is substantial evidence before the court* indicating that the accused may be mentally incompetent.' " *Young*, 291 N.C. at 568, 231 S.E.2d at 581 (quoting *Crenshaw v. Wolff*, 504 F.2d 377, 378 (8th Cir. 1974), *cert. denied*, 420 U.S. 966, 43 L. Ed. 2d 445 (1975)) (alteration in original).

In the present case, there is some evidence in the record indicating that defendant had received precautionary treatment for depression and suicidal tendencies several months before trial. However, this evidence of past treatment, standing alone, does not constitute "substantial evidence" before the trial court, *id.*, indicating that defendant "lack[ed] the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense" at the time his trial commenced, *Drope*, 420 U.S. at 171, 43 L. Ed. 2d at 113. Moreover, the record does not indicate that either defendant or defense counsel raised any questions about defendant's capacity to proceed at any time during defendant's trial and capital sentencing proceeding. Accordingly, the trial court did not err by failing to institute, on its own motion, a hearing to determine defendant's capacity to proceed. This assignment of error is overruled.

[2] By assignment of error, defendant contends the short-form murder indictment violated his federal constitutional rights, as it failed to allege all the elements of first-degree murder. At the outset, we note that defendant did not challenge the murder indictment in the trial court. Constitutional questions "not raised and passed upon in the trial will not ordinarily be considered on appeal." *State v. Hunter*, 305 N.C. 106, 112, 286 S.E.2d 535, 539 (1982). Moreover, a defendant waives an attack on the indictment when the indictment is not challenged at trial. *State v. Robinson*, 327 N.C. 346, 361, 395 S.E.2d 402, 411 (1990). However, when an indictment is alleged to be facially invalid, thereby depriving the trial court of its jurisdiction, the indictment may be challenged at any time, notwithstanding a defendant's failure to contest its validity in the trial court. *Braxton*, 352 N.C. at 173, 531 S.E.2d at 437. Thus, this issue is properly before this Court.

STATE v. KING

[353 N.C. 457 (2001)]

In support of his challenge to the validity of the murder indictment, defendant cites, among other things, the United State Supreme Court's decisions in *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311 (1999), and *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435 (2000). This Court has repeatedly addressed and rejected defendant's argument. *See, e.g., Braxton*, 352 N.C. 158, 531 S.E.2d 428. In *Braxton*, this Court examined the validity of short-form indictments in light of the Supreme Court's decisions in *Jones* and *Apprendi*, and concluded that nothing in either case altered prior case law on these matters. *Braxton*, 352 N.C. at 175, 531 S.E.2d at 437-38. Defendant presents no compelling basis for this Court to revisit the issue in the present case. This assignment of error is overruled.

## JURY SELECTION

[3] By assignment of error, defendant contends the trial court erred by overruling defendant's objection to the State's alleged impermissible use of peremptory challenges to strike from the jury six African-American prospective jurors solely on account of their race. We disagree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the Constitution of North Carolina forbid the use of peremptory challenges for racially discriminatory purposes. *Batson v. Kentucky*, 476 U.S. 79, 89, 90 L. Ed. 2d 69, 83 (1986); *State v. Lawrence*, 352 N.C. 1, 13, 530 S.E.2d 807, 815 (2000), —— U.S. ——, 148 L. Ed. 2d 684 (2001); *State v. Fletcher*, 348 N.C. 292, 312, 500 S.E.2d 668, 680 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999). In *Batson*, the United States Supreme Court set forth a three-pronged test to determine whether a prosecutor has engaged in impermissible racial discrimination in the selection of jurors. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89; *accord Hernandez v. New York*, 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405 (1991); *State v. Braxton*, 352 N.C. 158, 179, 531 S.E.2d 428, 440 (2000), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 797 (2001).

First, the defendant must establish a *prima facie* case that the State has exercised a peremptory challenge on the basis of race. *Hernandez*, 500 U.S. at 358, 114 L. Ed. 2d at 405. All the relevant circumstances are considered, including the "defendant's race, the victim's race, the race of key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimi-

nation, a pattern of strikes against minorities, or the State's acceptance rate of prospective minority jurors." *State v. White*, 349 N.C. 535, 548, 508 S.E.2d 253, 262 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999); *accord State v. Quick*, 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995).

Second, if the defendant makes the required showing, the burden shifts to the State to offer a race-neutral explanation for striking the particular juror. *Hernandez*, 500 U.S. at 358-59, 114 L. Ed. 2d at 405; *State v. Hardy*, 353 N.C. 122, 128, 540 S.E.2d 334, 340 (2000). The prosecutor's explanation must be clear and reasonably specific, but " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). "The prosecutor is not required to provide a race-neutral reason that is persuasive or even plausible." *Hardy*, 353 N.C. at 128, 540 S.E.2d at 340; *accord Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680. Moreover, " '[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *State v. Bonnett*, 348 N.C. 417, 433, 502 S.E.2d 563, 574-75 (1998) (quoting *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406), *cert. denied*, 525 U.S. 1124, 142 L. Ed. 2d 907 (1999). The second prong also provides the defendant an opportunity for surrebuttal to show that the State's explanations for the challenge are merely pretextual. *State v. Gaines*, 345 N.C. 647, 668, 483 S.E.2d 396, 408, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997).

When the trial court explicitly rules that a defendant failed to make out a *prima facie* case, review by this Court is limited to whether the trial court's finding was in error. *Fletcher*, 348 N.C. at 320, 500 S.E.2d at 684. However, when the trial court does not explicitly rule on whether the defendant made a *prima facie* case and where the State is directed to proceed to the second prong of *Batson* by articulating its explanation for the challenge, the question of whether the defendant established a *prima facie* case becomes moot. *State v. Williams*, 343 N.C. 345, 359, 471 S.E.2d 379, 386 (1996), *cert. denied*, 519 U.S. 1061, 136 L. Ed. 2d 618 (1997).

Pursuant to the third prong under *Batson*, "the trial court must make the ultimate determination as to whether the defendant has carried his burden of proving purposeful discrimination." *Braxton*, 352 N.C. at 180, 531 S.E.2d at 441 (citing *Hernandez*, 500 U.S. at 359, 114 L. Ed. 2d at 405); *accord Bonnett*, 348 N.C. at 433, 502 S.E.2d at 575. A trial court's rulings regarding race-neutrality and purposeful

discrimination are largely based on evaluations of credibility and should be given great deference. *Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21; *Bonnett*, 348 N.C. at 433, 502 S.E.2d at 575. This Court will uphold the trial court's determination unless convinced it is clearly erroneous. *Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680; *State v. Kandies*, 342 N.C. 419, 434-35, 467 S.E.2d 67, 75, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996). " 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *State v. Thomas*, 329 N.C. 423, 433, 407 S.E.2d 141, 148 (1991) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528 (1985)).

In the present case, defendant argues that the State exercised peremptory challenges to excuse five African-American prospective jurors. At the outset, we note our independent review of the record reveals that the State in fact exercised peremptory challenges to excuse six African-American prospective jurors. The State exercised four of these peremptory challenges during the selection of the jury and the balance during the selection of the two alternate jurors. In any event, in his brief, defendant specifically challenges only the prosecutor's exercise of a peremptory challenge against prospective juror Stephanie Bruce.

With regard to prospective juror Bruce, the record reveals that defendant made a *Batson* objection after the prosecutor indicated his desire to exercise a peremptory challenge to remove Bruce from the panel. Without ruling on the objection, the trial court directed the prosecutor to assert his reasons for peremptorily challenging Bruce. The prosecutor offered the following explanation:

[PROSECUTOR]: . . . I am aware from another source of information, Your Honor, that her father, who she indicated on her questionnaire, was a police officer and a detective. That he in fact was—it's my understanding was charged and was ultimately fired or forced to resign, you know, some situation of that type, from the police department over some kind of a drug matter. And he was—my understanding at the time was a narcotics officer. I have attempted to run a criminal record. I do not find that—if there was a formal charge lodged that it ever made it to the computer or to that stage. But apparently, from my information, that a search warrant was executed and whatever information was involved resulted in that situation. That I asked several questions, and one in particular, of the juror, regarding any kind of an unpleasant experience with the police department, something of

that matter, that should have caused, based on my information, an affirmative response from Ms. Bruce. She did not give me an affirmative response and that caused me concern about her truthfulness, obviously.

In addition, she indicated that an uncle was murdered, and it was just my reaction and that of my family member who is present that Ms. Bruce had some kind of reaction to that situation that might affect her decision in this kind of a case.

The trial court then gave defense counsel an opportunity to respond. Defense counsel argued to the court that the prosecutor's information with regard to Bruce's father was outside the record of this case and that there was no showing that Bruce's father was in fact the same individual who had a charge placed against him. Defense counsel also noted that Bruce previously indicated that she had nothing in her background to cause her any concern about being a fair and impartial juror and that there was no unpleasant experience in her background that would cause her to distrust the police. The trial court ruled that the prosecutor had presented an "adequate and a neutral explanation" for exercising a peremptory challenge to remove Bruce.

Defendant contends that the prosecutor's proffered explanation regarding Bruce's father was insufficient. Specifically, defendant argues there is no evidence in the record to support the prosecutor's belief that the police detective who was forced to resign is Bruce's father. We note, however, that the issue for the trial court is the "facial validity" of the prosecutor's stated reason, and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406; *see also Hardy*, 353 N.C. at 129, 540 S.E.2d at 341 ("[T]he prosecution is not required to show that [the prospective juror] could not understand the evidence, so long as the trial court believes that the race-neutral explanation is the prosecution's true motivation in exercising the challenge.").

Finally, with regard to Bruce's murdered uncle, defendant notes that the prosecutor accepted a white prospective juror whose wife had previously been raped, resulting in disparate treatment of similarly situated white jurors. Defendant argues that this disparate treatment demonstrates that the prosecutor's reasons for excusing Bruce were pretextual. It is true that "[t]he acceptance by the prosecution of white prospective jurors similarly situated to black prospective

jurors who have been peremptorily stricken is a factor to be considered in determining whether there has been purposeful racial discrimination." *Lawrence*, 352 N.C. at 15, 530 S.E.2d at 816; *see also Fletcher*, 348 N.C. at 317, 500 S.E.2d at 683. However, defendant's approach in this case " 'involves finding a single factor among several articulated by the prosecutor . . . and matching it to a passed juror who exhibited that same factor.' This approach 'fails to address the factors as a totality which when considered together provide an image of a juror considered . . . undesirable by the State.' " *State v. Robinson*, 330 N.C. 1, 19, 409 S.E.2d 288, 298 (1991) (quoting *Porter*, 326 N.C. at 501, 391 S.E.2d at 152-53)(alteration in original).

We have exhaustively reviewed the transcript and conclude that the explanations offered by the State do not appear to have been motivated by purposeful discrimination but are both race-neutral and otherwise appropriate reasons for exercising a peremptory challenge. *See, e.g., State v. Smith*, 352 N.C. 531, 541, 532 S.E.2d 773, 780 (2000) (holding that peremptory challenge based on prosecution's concern about prospective juror's veracity was race-neutral), *cert. denied*, —— U.S. ——, 149 L. Ed. 2d 360 (2001). We reiterate that a prosecutor's explanations for a peremptory strike " 'need not rise to the level justifying exercise of a challenge for cause.' " *Porter*, 326 N.C. at 498, 391 S.E.2d at 151 (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88).

In short, the trial court's determination that there was no purposeful discrimination in the challenge of prospective juror Bruce is not clearly erroneous. *See Fletcher*, 348 N.C. at 313, 500 S.E.2d at 680; *Kandies*, 342 N.C. at 434-35, 467 S.E.2d at 75. This assignment of error is overruled.

[4] By assignment of error, defendant contends that the trial court improperly limited defendant's questioning during *voir dire* of prospective juror Clarence Newnam. We disagree.

In the present case, defense counsel thoroughly questioned prospective juror Newnam during *voir dire*. During questioning, defense counsel made the following two inquiries:

[DEFENSE COUNSEL]: Now, do you feel like if there happened to be a conviction of first-degree murder that you would automatically vote for the death penalty?

[PROSPECTIVE JUROR NEWNAM]: If the circumstances were such that the law required that. Yes.

[DEFENSE COUNSEL]: Okay. Now, if we got to [the capital sentencing proceeding], again, it would be a situation where somebody—we're not talking about, you know, self-defense or anything like that. We're talking about if there had been a finding of premeditated killing, somebody wanted to do it, thought about it, and then did it, that would be first-degree murder. So that's the circumstances we'd be at when you got to the second stage. Do you feel like in that situation you would—you would pretty much automatically vote for life—or the death penalty?

The prosecutor objected to the second inquiry, characterizing it as a "stake-out" question, and the trial court sustained the objection. Defendant argues that his question of prospective juror Newnam should have been allowed, based on the United States Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992).

In *Morgan*, the United States Supreme Court held that a defendant must be allowed "to lay bare the foundation of [his] challenge for cause against those prospective jurors who would *always* impose death following conviction." *Id.* at 733, 119 L. Ed. 2d at 506. This Court has recognized that:

> "*Morgan* stands for the principle that a defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty. 'Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion.' *State v. Yelverton*, 334 N.C. 532, 541, 434 S.E.2d 183, 188 (1993)."

*State v. Richardson*, 346 N.C. 520, 532, 488 S.E.2d 148, 155 (1997) (quoting *State v. Robinson*, 336 N.C. 78, 102-03, 443 S.E.2d 306, 317 (1994), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995)), *cert. denied*, 522 U.S. 1056, 239 L. Ed. 2d 652 (1998).

We have also stated that "[t]he trial court may refuse to allow counsel to ask questions that use hypothetical evidence or scenarios to attempt to 'stake-out' prospective jurors and cause them to pledge themselves to a particular position in advance of the actual presentation of the evidence." *Fletcher*, 348 N.C. at 308, 500 S.E.2d at 677. "Jurors should not be asked what kind of verdict they would render under certain named circumstances." *State v. Phillips*, 300 N.C. 678,

682, 268 S.E.2d 452, 455 (1980), *quoted in State v. Elliott,* 344 N.C. 242, 265, 475 S.E.2d 202, 211 (1996), *cert. denied,* 520 U.S. 1106, 137 L. Ed. 2d 312 (1997).

In this case, we conclude that the trial court did not abuse its discretion by disallowing defendant's question of prospective juror Newnam. The trial court did not violate *Morgan* because defendant was allowed to explore the juror's consideration of life as a possible sentence. Immediately prior to the challenged inquiry, defense counsel was permitted to ask prospective juror Newnam, in accordance with *Morgan,* whether he would "automatically vote for the death penalty" if defendant was convicted of first-degree murder. As noted above, Newnam responded, "If the circumstances were such that the law required that. Yes."

We perceive that this inquiry by defense counsel, along with other questions asked of Newnam, was sufficient to satisfy the requirements of *Morgan.* Further, we note that prospective juror Newnam appropriately indicated that he would vote for the death penalty only if the law required that punishment under the facts of this case. We further note that the challenged inquiry was not merely an appropriate question designed to determine whether Newnam would "automatically" or "always" vote for the death penalty without regard to the law. *See State v. Conner,* 335 N.C. 618, 643-45, 440 S.E.2d 826, 840-41 (1994). Rather, defendant's question was an improper attempt to "stake-out" prospective juror Newnam and determine what sentence he would vote for if defendant was convicted of first-degree murder under a theory of premeditation and deliberation without evidence of an affirmative defense. Therefore, the trial court did not abuse its discretion when it determined that the challenged question was improper. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[5] By assignments of error, defendant contends that the trial court erred by allowing the State to introduce handwritten portions of the victim's diary into evidence. Specifically, defendant argues the challenged evidence constitutes inadmissible hearsay. We disagree.

Underwood, the victim's daughter, identified the four pages at issue as being in her mother's handwriting. The pages appear to be portions of a journal and state as follows:

Today is Tuesday, September 6, 1988. James came by this morning about 8:30 a.m. Woke me up wanting sex. Said he was going

to his room and get some rest. He worked—he worked the 11:00 p.m. to 7 a.m. shift last night. About 12:45, I rode by James' rooming house taking Janice to work. James' car was not there. The first thought that went through my mind was he was over Betty's house. So after I left Janice, I rode over on 9-B Lakespring Court and there was the car sitting in front of her house. I got out of the car and knocked on the door. Betty's answered—Betty answered the door. I asked her was James there. She didn't answer my question. She asked me who I was. I said his wife. She closed the door in my face. I got back in the car and drove home. I went up Minnie's house and told her what happened. Before I could finish, James came through the back door. I asked him why did he come, and he could go right back and stay. Then I left and got back in the car. He came out to the car. I locked all the doors and windows. I took Minnie to Bingo Busters and came back to my mother's. James gave Betty my mother's telephone number and she called here. I hung up on her. Later James showed up over here again. I got my cousin to take me to bingo, so I would not run into him. He had his cousin come over my mother's house. I wasn't there.

Today is Thursday, September [8th]. James has not been by again or called.

Today is Friday, September 9. James came by at 9 p.m. today. I still love him, but I'm tired of being a fool. From the first year of our meeting until Tuesday, off and on, you have been here—been a heavy burden to bear. I've tried to let you know that I love you and wanted to care for you. We have not been a married couple. Only on paper. I tried really hard when you had your stroke to show you I cared. Since the time I had cramps in my stomach and leg in Liberty, [North Carolina,] I realized that you did not want to have to take care of me. When my chest was cramping and all you was worried about was when you could [f--k] again. Even at Po Folks, when I got sick on the stomach, you were more worried about getting out of the place without paying the bill that you walked off and you left me behind. I have not gotten the respect from you that I deserve for a long time. I fought myself also, because I went along instead of demanding my rights as a woman. You used me for a long time. Took advantage whenever you could. You talked so much about what you have done for me and my children. We had to put up with with [sic] you, your attitudes and wrath. We are a couple of grown kids playing man and

wife. I put up with you lasciviousness and disrespect to my children. I put up with your sleeping with Betty before we got married. I listened to how lonely you felt and how no one cared about you. I put up with you penny pinching and stinginess. You acted like the food you eat, the place you slept in, not having to pay rent meant nothing. When I—when I meet you, you work making at less than $7 an hour. You cannot keep a home for yourself, feed yourself, nor clean up after yourself. You will never grow up in that respect. I watched enough of my life—I wasted enough of my life living with your lying A-S-S. Yes, I feel used, but no one—but not one other day, hour, minute or second will I spend with you. Since I moved here, you've been able to come eat, sleep, rest. No more. Yes, I feel you owe me. I should have left you long after what happened when I was pregnant. You will never find happiness until you find the Lord. Stay away from me and we will live happily. No more lies. You spit in the face of my love for you. Your ex-wife.

The car belongs to the both of us and I want to be able to use it. You should be giving me money when you get paid. Yes, I want what you owe me. This is all you can ever do for me again. Send the money in the mail. 1730 Dunbar Street. This is a safe address.

Defendant contends that the handwritten entries are a factual recitation and therefore are not statements of the declarant's then-existing mental, emotional, or physical condition. *See* N.C.G.S. § 8C-1, Rule 803(3) (1999).

The trial court found that these statements were admissible under Rule 803(3) of the North Carolina Rules of Evidence, which provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed

> unless it relates to the execution, revocation, identification, or terms of declarant's will.

*Id.*

This Court has previously applied the Rule 803(3) exception to both oral and written statements. *See, e.g., State v. McElrath*, 322 N.C. 1, 17, 366 S.E.2d 442, 451 (1988) (telephone message written by neighbor from victim to his roommate that victim was traveling to North Carolina with the defendant was hearsay but was admissible under exception as evidence of then-existing mental, emotional, or physical condition). We have stated that "[e]vidence tending to show the victim's state of mind is admissible so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991), *quoted in State v. Brown*, 350 N.C. 193, 201, 513 S.E.2d 57, 62 (1999), *and quoted in State v. Westbrooks*, 345 N.C. 43, 59, 478 S.E.2d 483, 493 (1996). "The victim's state of mind is relevant if it bears directly on the victim's relationship with the defendant at the time the victim was killed." *State v. Bishop*, 346 N.C. 365, 379, 488 S.E.2d 769, 776 (1997); *accord Westbrooks*, 345 N.C. at 59, 478 S.E.2d at 493. Moreover, we have also stated that "a victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant." *State v. McLemore*, 343 N.C. 240, 246, 470 S.E.2d 2, 5 (1996); *see also State v. McHone*, 334 N.C. 627, 637, 435 S.E.2d 296, 301-02 (1993) (state of mind relevant to show a stormy relationship between the victim and the defendant prior to the murder), *cert. denied*, 511 U.S. 1046, 128 L. Ed. 2d 220 (1994); *State v. Lynch*, 327 N.C. 210, 224, 393 S.E.2d 811, 819 (1990) (the defendant's threats to the victim shortly before the murder admissible to show the victim's then-existing state of mind); *State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990) (the victim's statements regarding the defendant's threats relevant to the issue of her relationship with the defendant).

In the present case, the victim's challenged statements about her frustration with defendant and her intent to end their marriage were statements indicating the victim's " 'mental condition at the time [the statements] were made and were not merely a recitation of facts.' " *Brown*, 350 N.C. at 201, 513 S.E.2d at 62 (quoting *Westbrooks*, 345 N.C. at 59, 478 S.E.2d at 492). The victim's journal entries "bear[] directly on the victim's relationship with the defendant at the time the victim was killed." *Bishop*, 346 N.C. at 379, 488 S.E.2d at 776. Moreover, the challenged evidence " 'relates directly to circumstances giving rise to a potential confrontation with the defendant,' "

*id.*, (quoting *McLemore*, 343 N.C. at 246, 470 S.E.2d at 5), in that the victim apparently intended to reject defendant's attempts at reconciliation. Thus, these statements were relevant and admissible as statements of the declarant's then-existing state of mind. For the above reasons, these assignments of error are overruled.

**[6]** By assignments of error, defendant contends the trial court erred in admitting out-of-court statements of several witnesses under the residual hearsay exception because the declarations lacked adequate guarantees of trustworthiness and reliability. Defendant further argues that the State did not provide him adequate notice of its intention to offer the challenged hearsay statements into evidence. We disagree.

N.C.G.S. § 8C-1, Rule 804(b)(5) provides:

(b) Hearsay exceptions.—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(5) Other Exceptions.—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

N.C.G.S. § 8C-1, Rule 804(b)(5) (1999). The admissibility of statements under 804(b)(5) is dependent first on whether the declarant is unavailable. A declarant is "unavailable," for purposes of the residual exception to hearsay rule, when he or she is deceased at the time of trial. N.C.G.S. § 8C-1, Rule 804(a)(4).

This Court has articulated the guidelines for admission of hearsay testimony under Rule 804(b)(5). After the trial court has resolved that the declarant is unavailable, it must then conduct a six-part inquiry to determine if the hearsay statements may be admitted into evidence. The trial court must determine:

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses "equivalent circumstantial guarantees of trustworthiness";

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is "more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means"; and

(6) Whether "the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence."

*State v. Ali*, 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (quoting N.C.G.S. § 8C-1, Rule 804(b)(5)); *see State v. Triplett*, 316 N.C. 1, 9, 340 S.E.2d 736, 741 (1986). Under the third step of this analysis—determining whether the hearsay statement sought to be admitted is trustworthy—this Court has directed trial courts to consider the following:

(1) whether the declarant had personal knowledge of the underlying events, (2) the declarant's motivation to speak the truth or otherwise, (3) whether the declarant has ever recanted the statement, and (4) the practical availability of the declarant at trial for meaningful cross-examination.

*State v. Tyler*, 346 N.C. 187, 195, 485 S.E.2d 599, 603 (citing *Triplett*, 316 N.C. at 10-11, 340 S.E.2d at 742), *cert. denied*, 522 U.S. 1001, 139 L. Ed. 2d 411 (1997). This Court has also determined that the nature and character of the statement and the relationship of the parties are pertinent in determining the trustworthiness of the statement. *State v. Brown*, 339 N.C. 426, 437, 451 S.E.2d 181, 188 (1994) (citing

*Triplett*, 316 N.C. at 11, 340 S.E.2d at 742), *cert. denied*, 516 U.S. 825, 133 L. Ed. 2d 46 (1995).

In the present case, the trial court made extensive findings of fact in the record concerning the admissibility of each of the challenged hearsay statements, which have aided this Court in its analysis. The statements in question were made by Pennix, Hayes, Alston, and Durham to Greensboro police officers between 11 and 13 September 1988. All four of the declarants were unavailable at the time of trial because they had all died during the almost nine-year period that defendant remained a fugitive from the law. Both Pennix and Hayes made their statements on 11 September 1988, the day of the murder; Durham made his statement on 12 September 1988; and Alston made his statement on 13 September 1988. Pennix died on 17 December 1992, Hayes died on 14 April 1995, Alston died on 30 July 1997, and Durham died on 8 September 1994.

Defendant contends that the State did not give sufficient notice of its intention to introduce these statements, and therefore, the statements should not have been allowed into evidence. Defendant received written notice on 14 October 1998 of the prosecution's intent to introduce the statements and actual copies of the handwritten statements on 19 October 1998. The State filed written notice of the intention to offer the four statements on 15 October 1998. This Court has stated that "the notice requirement should be construed 'somewhat flexibly, in light of the express policy of providing a party with a fair opportunity to meet the proffered evidence.' The central inquiry is whether the notice gives the opposing party a fair opportunity to meet the evidence." *Ali*, 329 N.C. at 410, 407 S.E.2d at 193 (quoting *Triplett*, 316 N.C. at 13-14, 340 S.E.2d at 743).

The trial court in the present case determined that defendant received notice of the statements "sufficiently in advance of the offering of the hearsay to allow the defense to prepare to meet the statement[s]." A pretrial hearing concerning the admissibility of the challenged statements was held on 19 October 1998, but the trial judge deferred his final ruling until the defense had an opportunity to review and inspect the files of the Greensboro Police Department for any evidence of a recantation. In addition, the trial court specifically noted that the Public Defender's office, which had an attorney serving as counsel for the defendant in this case, had an investigator on staff. *See Ali*, 329 N.C. at 410, 407 S.E.2d at 193 (notice was sufficient to inform the defendant of the substance of the declarant's state-

ments when it was delivered eleven days prior to trial, and the defendant had a private investigator who interviewed the witness). Based on the foregoing, we conclude the trial court's reasoning was sufficient to support its determination that the notice of the State's intent to offer the challenged statements into evidence was adequate.

Defendant also contends the trial court failed to make sufficient findings of fact to establish that the statements at issue possessed "equivalent circumstantial guarantees of trustworthiness" and, therefore, should not have been admitted into evidence. The record reveals that the trial court addressed each of the challenged statements separately under Rule 804(b)(5) and found them to be trustworthy and reliable.

Pennix and Hayes both made very similar statements to the police on 11 September 1988. As previously noted, Pennix and Hayes gave statements to the authorities indicating that they played bingo with the victim shortly before she was killed. Both Pennix and Hayes observed defendant outside of a bingo parlor speaking with the victim. On the date of their statements, Pennix and Hayes had personal knowledge of both the victim and defendant, as well as the nature of their relationship. Both witnesses saw defendant lead the victim by the arm to the side of the bingo parlor. In addition, both witnesses heard defendant state that he would take the victim home.

Ample evidence of the reliability and trustworthiness of Pennix's and Hayes' statements was proffered by the State. Both Pennix and Hayes were motivated to tell the truth because both women were close friends of the victim's and also knew defendant. Moreover, neither woman had ever expressed any ill will towards defendant, there was no indication that either woman was biased against defendant, and neither had any motivation to lie.

The trial court properly determined that the nature of both women's statements made them reliable and trustworthy. Pennix and Hayes were two of the last people to see the victim alive. Both women made their statements separately to an officer of the law, approximately fourteen hours after last seeing the victim and defendant together. In addition, there is no record of Pennix or Hayes ever recanting their stories. In short, the trial court made sufficient findings of fact to conclude that Pennix's and Hayes' statements to the police possessed "equivalent circumstantial guarantees of trustworthiness."

We likewise conclude that the challenged statements of Pennix and Hayes were more probative than any other evidence that the State could have produced through reasonable means and were otherwise necessary to the prosecution of defendant. Although the statements by Pennix and Hayes do corroborate the statement of Foushee, who testified at trial, Pennix's and Hayes' statements are more probative on some points than any other evidence that the State could reasonably produce. Specifically, Pennix and Hayes left the bingo parlor with the victim and personally observed defendant lead the victim to the side of the building and begin speaking with her. Foushee, however, left the bingo parlor approximately ten minutes later and only observed defendant speaking with the victim, while "boxing [the victim] in." In addition, Hayes personally asked the victim whether she was leaving with Pennix and Hayes, and defendant told them he would take the victim home. Accordingly, the findings of fact by the trial court support the admission of the statements made by Pennix and Hayes under Rule 804(b)(5).

Alston made his statement to police on 13 September 1988. As previously noted, Alston spent time with defendant in the days leading to the murder and last saw defendant at approximately 11:30 p.m. on 10 September 1988. Defendant enlisted Alston to help him reconcile with the victim. In addition, Alston observed a .22-caliber revolver over the sun visor in defendant's vehicle.

Ample evidence of the trustworthiness and reliability of Alston's statements was introduced at trial. Alston had personal knowledge of defendant, the victim, and the condition of their marriage. Alston was in the presence of defendant for extended periods of time during the days and hours before the murder and witnessed defendant's extensive efforts to have someone speak with his wife on his behalf. Alston was motivated to tell the truth because he had expressed no ill will toward defendant. To the contrary, Alston was defendant's cousin, as well as his confidant, negating any motive to incriminate defendant falsely. Alston spoke with the police within sixty hours after victim was killed, while the events were still fresh on his mind. Like Pennix and Hayes, there is no record of Alston ever recanting his story. Alston closely witnessed the turmoil defendant was experiencing over his wife. His statement was a narrative of the week before the murder, and there is no significant reason to suspect inaccuracy or lack of trustworthiness. Therefore, the trial court's findings of fact support its conclusion that Alston's statements to the police possessed "equivalent circumstantial guarantees of trustworthiness."

STATE v. KING

[353 N.C. 457 (2001)]

Furthermore, the statements of Alston were more probative than other evidence reasonably available to the State and were otherwise necessary to the prosecution of defendant. Alston was one of two people whose testimony could establish that defendant actually possessed a .22-caliber weapon prior to the murder. In addition, Alston was the only witness found who could describe how defendant was repeatedly seeking help to reestablish his relationship with his wife. Based on the foregoing, we conclude the trial court's findings were sufficient to support the admission of Alston's challenged statements under Rule 804(b)(5).

Durham made his challenged statements to the police on 12 September 1988. As previously noted, Durham and defendant had served time in prison together prior to the murder. In the days before the murder, defendant asked Durham questions about a .22-caliber gun. Specifically, defendant asked "if you put a 22 against somebody's head, will you kill them?" to which Durham responded in the affirmative, saying, "[Y]es. That's a deadly weapon."

The trial court determined that Durham's statements were reliable and trustworthy. On the day of his statement, Durham knew defendant personally but did not know that the victim was defendant's wife. The trial court determined that Durham's statements were reliable and that Durham was motivated to tell the truth. The trial court specifically noted that Durham spoke with police within two days after the murder and within several days of his conversation with defendant about the effect of a .22-caliber weapon on a human head, indicating that the events were still fresh on his mind. The trial court also noted that Durham apparently never recanted his story. In addition, Durham had expressed no ill will toward defendant, was not biased against defendant, and had no motivation to lie. The trial court noted that, because Durham and defendant had served prison time together and were friends, they would have had unguarded conversations. Based on this evidence, the trial court's findings were sufficient to support its conclusion that Durham's statements to the police possessed "equivalent circumstantial guarantees of trustworthiness."

The trial court also properly determined that the statements of Durham were more probative than other evidence reasonably available to the State and were otherwise necessary to the prosecution of defendant. Durham's statements supported witness Betty James' testimony that defendant had a .22-caliber revolver and was talking about killing the victim. Based on the foregoing, we conclude the trial

court's findings of fact were sufficient to support the admission of Durham's challenged statements under Rule 804(b)(5).

We note that the trial court thoroughly addressed the admissibility of the challenged statements under Rule 804(b)(5) and properly determined that the statements of all four witnesses were admissible. We conclude that the evidence before the trial court supports its findings of fact, which in turn supports its conclusions of law. These assignments of error are overruled.

**[7]** By assignment of error, defendant contends the trial court erred by denying defendant's request to instruct the jury on the lesser-included offense of second-degree murder. We disagree.

First-degree murder is defined as "the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert. denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). Second-degree murder is defined as " 'the unlawful killing of a human being with malice, but without premeditation and deliberation.' " *State v. Thibodeaux*, 352 N.C. 570, 582, 532 S.E.2d 797, 806 (2000) (quoting *Flowers*, 347 N.C. at 29, 489 S.E.2d at 407), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 976 (2001).

A defendant is " 'entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater.' " *State v. Leazer*, 353 N.C. 234, 237, 539 S.E.2d 922, 924 (2000) (quoting *Keeble v. United States*, 412 U.S. 205, 208, 36 L. Ed. 2d 844, 847 (1973)). This Court has explained the test for determining whether an instruction on second-degree murder is required as follows:

> "The determinative factor is what the State's evidence tends to prove. If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and deliberation, and there is no evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration the possibility of a conviction of second degree murder."

*State v. Gary*, 348 N.C. 510, 524, 501 S.E.2d 57, 66-67 (1998) (quoting *State v. Strickland*, 307 N.C. 274, 293, 298 S.E.2d 645, 658 (1983), *overruled in part on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986)).

In the present case, the State's uncontradicted evidence tends to show that defendant killed the victim with premeditation and deliberation. Defendant purchased a .22-caliber weapon and ammunition several days before the murder. When defendant test-fired the weapon and found that it was not properly functioning, he had it repaired. Defendant also made several statements prior to the murder evidencing a premeditated and deliberate intent to kill. Defendant asked a friend whether he could kill someone by putting a .22-caliber weapon to her head and shooting her. Defendant also repeatedly announced his intent to kill the victim to his girlfriend, Betty, in the days leading up to the murder. Further, defendant inquired about borrowing someone's car on the day of the murder although his vehicle was functioning properly. Shortly before the murder, defendant was observed talking to the victim while placing his arms on either side of her, "boxing her in" against a building. Finally, the victim was shot seven times, including four wounds to the head and two close-contact wounds.

Notwithstanding the State's positive and uncontradicted evidence of each element of first-degree murder, defendant argues that, based on his desire to reconcile with the victim, it is "possible" that a conflict erupted between defendant and the victim that resulted in her death. As this Court has previously recognized, however, "mere speculation is not sufficient to negate evidence of premeditation and deliberation." *Gary*, 348 N.C. at 524, 501 S.E.2d at 67. Accordingly, the trial court properly refused to submit an instruction on second-degree murder. This assignment of error is overruled.

## SENTENCING PROCEEDING

[8] By assignment of error, defendant contends the trial court erred by failing to submit to the jury the (f)(1) mitigating circumstance: "The defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1) (1988) (amended 1994).

In determining whether to submit the (f)(1) mitigating circumstance, the trial court must decide " 'whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity.' " *State v. Blakeney*, 352 N.C. 287, 318, 531 S.E.2d 799, 821 (2000) (quoting *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988)), *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 780 (2001); *accord State v. White*, 343 N.C. 378, 394-95, 471 S.E.2d 593, 602-03, *cert. denied*, 519 U.S. 936, 136 L. Ed. 2d 229 (1996). When evaluating whether a defendant's history is "significant" under subsection

15A-2000(f)(1), "the [trial court's] focus should be on whether the criminal activity is such as to influence the jury's sentencing recommendation." *State v. Greene*, 351 N.C. 562, 569, 528 S.E.2d 575, 580, *cert. denied*, —— U.S. ——, 148 L. Ed. 2d 543 (2000). "[T]he nature and age of the prior criminal activities are important, and the mere number of criminal activities is not dispositive." *Id.* at 570, 528 S.E.2d at 580; *accord State v. Walls*, 342 N.C. 1, 56, 463 S.E.2d 738, 767 (1995), *cert. denied*, 517 U.S. 1197, 134 L. Ed. 2d 794 (1996).

During the sentencing proceeding in the present case, the State presented testimonial and documentary evidence that defendant had previously been convicted of the first-degree murder of his former wife, Shirley Harris King, and was sentenced to life imprisonment (defendant was later paroled). The State's evidence tended to show that, in 1967, defendant killed his then twenty-year-old wife by shooting her in the head with a shotgun.

Based on this evidence, the trial court properly concluded that no rational juror could have concluded that defendant's prior criminal activity was insignificant and, therefore, that defendant's criminal history "would not have influenced or had an effect upon the jury verdict as a mitigating circumstance." *Greene*, 351 N.C. at 570, 528 S.E.2d at 580-81. We note this Court has previously recognized that the (f)(1) mitigating circumstance is not properly submitted in cases, such as the present case, that involve "a prior criminal history which includes a violent felony involving death." *State v. McNeil*, 350 N.C. 657, 684, 518 S.E.2d 486, 503 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 321 (2000). Accordingly, this assignment of error is overruled.

**[9]** By assignment of error, defendant contends the trial court erred in its response to the jury's question concerning whether a recommendation of a life sentence had to be unanimous. Defendant argues the trial court's instruction to the jury in this regard was contrary to controlling precedent. We disagree.

At the conclusion of the sentencing proceeding in the present case, the trial court instructed the jury in accordance with N.C.G.S. § 15A-2000 and the North Carolina Pattern Instructions. N.C.P.I.—Crim. 150.10 (2000). Each juror had a written "Issues and Recommendation as to Punishment" form to use as a guide as the trial court gave the appropriate instruction. At the conclusion of the jury charge, but prior to jury deliberations, the jury passed a note to the trial court, which reads as follows: "Your Honor, Is it required to

be a unanimous decision for the life term?" In response to that question, the trial court instructed the jury as follows:

Now, you are participating, members of the jury, in a process. And that process is a step-by-step process. And you begin the process from the top, from the beginning, and you take it step-by-step. You don't sit down and first say what shall the punishment be. You consider the various issues that are before you.

I instruct you that your answers to issues one, three, and four must be unanimous.

As you go along, if you have questions, have things to report to me, you can certainly do that, and I'll consider all of the requests and any report that you give me as you go along.

The jury then retired. Based on defendant's repeated requests, however, the trial court brought the jurors back in and further instructed them consistent with *State v. Smith*, 320 N.C. 404, 358 S.E.2d 329 (1987).

In *Smith*, we held that if the jurors have reached an impasse in deliberations and they inquire about unanimity, "the trial court must inform the jurors that their inability to reach a unanimous verdict should not be their concern but should simply be reported to the court." *Id.* at 422, 358 S.E.2d at 339.

Here, the trial court further instructed the jury as follows:

THE COURT: I bring you back in . . . to report to you that after you left the courtroom, it was brought to my attention that some further instructions are necessary to add to the previous instructions I gave you with regard to the question which is, "Is it required to be unanimous decision for the life term?"

I instruct you that if you—if you are unable to reach a unanimous answer to issues one, three, or four, that should not be a concern. You should simply report that to the Court. If you are unable to reach a unanimous recommendation as to punishment, that should not be your concern. You should simply report that to the Court.

Defendant did not suggest an amendment or correction to the instruction given by the trial court when prompted. Thereafter, the jury deliberated and returned a recommendation for a sentence of death.

**STATE v. KING**

[353 N.C. 457 (2001)]

"In a capital sentencing proceeding, any jury recommendation requiring a sentence of death or life imprisonment must be unanimous." *State v. McCarver*, 341 N.C. 364, 389, 462 S.E.2d 25, 39 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996); *see also* N.C. Const. art. I, § 24; N.C.G.S. § 15A-2000(b). In this regard, we have stated:

> Since the sentence recommendation, if any, must be unanimous under constitutional and statutory provisions, and particularly in light of the overwhelming policy reasons for a unanimity requirement, we conclude that any issue which is outcome determinative as to the sentence a defendant in a capital trial will receive—whether death or life imprisonment—must be answered unanimously by the jury. That is, the jury should answer Issues One, Three, and Four on the standard form used in capital cases either unanimously "yes" or unanimously "no."

*McCarver*, 341 N.C. at 390, 462 S.E.2d at 39, *quoted in State v. Cheek*, 351 N.C. 48, 85, 520 S.E.2d 545, 566-67 (1999), *cert. denied*, 530 U.S. 1245, 147 L. Ed. 2d 965 (2000). This requirement of jury unanimity on Issues One, Three, and Four

> ensures that the jury *properly* fulfills its duty to deliberate *genuinely* for a *reasonable* period of time in its efforts to exercise guided discretion in reaching a unanimous sentencing recommendation, as required by the Constitution of North Carolina and by our death penalty statute itself.

*McCarver*, 341 N.C. at 392, 462 S.E.2d at 41.

Based on the foregoing, we conclude the trial court's response to the jury's question in the present case was correct. Specifically, the trial court properly informed the jury, in accordance with *McCarver* and the pattern jury instruction, that its "answers to issues one, three, and four must be unanimous." We also note that the trial court's instruction in accordance with our decision in *State v. Smith* was unwarranted. *See Smith*, 320 N.C. 404, 358 S.E.2d 329. An instruction pursuant to *Smith* is necessary only if the jury is divided or has reported an inability to reach a unanimous verdict. *Id.* at 422, 358 S.E.2d at 339. In this case, however, the jury had not yet begun deliberations when the question at issue was presented to the trial court. Accordingly, neither of the events triggering a *Smith* instruction could have occurred. In any event, the trial court, out of an abundance of caution, gave the additional instruction requested and

agreed to by defendant. "Therefore, if there was error in the charge, it was invited error and not subject to review." *State v. Cagle*, 346 N.C. 497, 509, 488 S.E.2d 535, 544, *cert. denied*, 522 U.S. 1032, 139 L. Ed. 2d 614 (1997). This assignment of error is overruled.

**[10]** By assignment of error, defendant contends the trial court erred by allowing the State to introduce testimony and photographs dealing with defendant's prior murder conviction. Defendant argues that the evidence unduly prejudiced the jury against him and was completely unnecessary to establish the (e)(3) aggravating circumstance. We disagree.

As previously noted, defendant was convicted of first-degree murder in 1967 for the murder of his first wife, Shirley Harris King, and was sentenced to life imprisonment. During the sentencing proceeding in the present case, the State introduced testimony about the earlier murder and photographs of the crime scene and the victim's body in that case. The photographs illustrated the testimony of the investigating officer, R.C. Booth, and supported the existence of the (e)(3) aggravating circumstance, that defendant had been previously convicted of a felony involving the use of violence to a person. N.C.G.S. § 15A-2000(e)(3). Three photographs were admitted into evidence. The first photograph depicted a shotgun, which was the murder weapon, lying on the ground outside of that victim's apartment. The second photograph shows that victim's body lying on the floor of her kitchen near the sink. The third photograph was of that victim's body at the morgue.

At the outset, we note that the Rules of Evidence do not apply in capital sentencing proceedings. N.C.G.S. § 8C-1, Rule 1101(b)(3) (1999). Therefore, the trial court has " 'great discretion to admit any evidence relevant to sentencing.' " *Blakeney*, 352 N.C. at 315, 531 S.E.2d at 819 (quoting *State v. Thomas*, 350 N.C. 315, 359, 514 S.E.2d 486, 513, *cert. denied*, 528 U.S. 1006, 145 L. Ed. 2d 388 (1999)). "Any evidence that the trial court 'deems relevant to sentenc[ing]' may be introduced in the sentencing proceeding." *State v. Heatwole*, 344 N.C. 1, 25, 473 S.E.2d 310, 322 (1996) (quoting *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996)), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). This Court has previously determined that

"the State must be permitted to present any competent evidence supporting the imposition of the death penalty," [*Heatwole*, 344 N.C. at 25, 473 S.E.2d at 322], including photographs of the vic-

tim. The State may introduce photographs and videotapes to illustrate the testimony of a witness regarding the manner of a killing. *State v. Kandies*, 342 N.C. 419, 444, 467 S.E.2d 67, 80, *cert. denied*, [519] U.S. [894], 136 L. Ed. 2d 167 (1996). Further, the State may present evidence of the circumstances surrounding a defendant's prior felony, notwithstanding the defendant's stipulation to the record of conviction, to support the existence of aggravating circumstances. *Heatwole*, 344 N.C. at 19, 473 S.E.2d at 319.

*State v. Warren*, 347 N.C. 309, 316, 492 S.E.2d 609, 612 (1997) (post-mortem photographs of defendant's prior victim were admissible to support the existence of the (e)(3) aggravating circumstance), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998).

Specific photographs of the victim that depict the injuries to the body and illustrate the manner of death are relevant in sentencing issues and may be used to illustrate a witness' testimony. *Heatwole*, 344 N.C. at 25, 473 S.E.2d at 322. " 'Photographs [depicting] the circumstances of the murder, the condition of the body, or the location of the body when found are relevant and admissible at sentencing, even when the victim's identity and the cause of death are not in dispute at trial. This is true even if the photographs are gory or gruesome.' " *Smith*, 352 N.C. at 555, 532 S.E.2d at 789 (quoting *State v. Williams*, 350 N.C. 1, 34, 510 S.E.2d 626, 648, *cert. denied*, 528 U.S. 880, 145 L. Ed. 2d 162 (1999)). Ultimately, "[w]hether photographic evidence is more probative than prejudicial is within the trial court's discretion." *Warren*, 347 N.C. at 316, 492 S.E.2d at 612-13 (citing *Heatwole*, 344 N.C. at 25, 473 S.E.2d at 322).

The trial court in the present case did not abuse its discretion in allowing admission of the challenged testimony and photographs concerning defendant's prior murder conviction. The trial court carefully reviewed all of the proposed testimony and each photograph that was offered into evidence and weighed the probative value against the danger of unfair prejudice. The trial court ultimately denied admission of the photographs that showed blood and brain matter throughout the murder scene and limited the testimony of the investigating officer. However, the trial court allowed limited evidence regarding the murder weapon used by defendant, the condition of that victim's body, and the location of the body and the wound because the evidence was relevant to establish the existence of the (e)(3) aggravating circumstance. Both the testimony and the photographs illustrated the significant injury that was inflicted on that

victim, thereby demonstrating the violence used to commit the felony. The trial court correctly determined that the probative value of the challenged evidence outweighed the danger of unfair prejudice. Accordingly, defendant has failed to show that the trial court abused its discretion by admitting the testimony and the photographs during the sentencing proceeding. This assignment of error is overruled.

**[11]** By assignment of error, defendant contends the trial court committed plain error by instructing the jury on Issue Three in a manner that allowed the jury to impose a death sentence by merely finding mitigation and aggravation of equal weight. We disagree.

Issue Three on the issues and recommendation form that was provided to the jury in this case required that the jury answer the following question: "Do you unanimously find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance found by you?" In addition, the trial court similarly instructed the jury to "decide from all the evidence what value to give to each circumstance and then weigh the aggravating circumstance so valued against the mitigating circumstance or circumstances so valued, and finally determine whether the mitigating circumstance or circumstances are insufficient to outweigh the aggravating circumstance."

We have repeatedly rejected precisely the same argument. Specifically, we have stated as follows:

"The defendant says [Issue Three] is deficient because if the jury is in equipose it must answer the issue 'yes' and impose the death penalty. We do not believe that the defendant['s] . . . analysis of the issue is correct. If the jury must be satisfied beyond a reasonable doubt before finding the mitigating circumstances are insufficient to outweigh the aggravating circumstances and the jury is in a state of equipose as to the issue it would answer the issue 'no.' We hold [that Issue Three] was properly submitted."

*State v. Keel,* 337 N.C. 469, 493-94, 447 S.E.2d 748, 762 (1994) (quoting *State v. Hunt,* 323 N.C. 407, 433, 373 S.E.2d 400, 416-17 (1988), *sentence vacated on other grounds,* 494 U.S. 1022, 108 L. Ed. 2d 602 (1990)) (alterations in original), *cert. denied,* 513 U.S. 1198, 131 L. Ed. 2d 147 (1995); *accord State v. Stephens,* 347 N.C. 352,

366-67, 493 S.E.2d 435, 444 (1997), *cert. denied*, 525 U.S. 831, 142 L. Ed. 2d 66 (1998). Defendant has presented no compelling basis for us to revisit our prior holdings on this issue. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises ten additional issues that he concedes this Court has previously decided contrary to his position: (1) the trial court committed plain error by telling the sentencing jury that it must be unanimous to answer "no" at Issues One, Three, and Four on the issues and recommendation sheet; (2) the trial court's instructions defining the burden of proof applicable to mitigating circumstances violated defendant's constitutional rights because they used the inherently ambiguous and vague terms "satisfaction" and "satisfy," thus permitting jurors to establish for themselves the legal standard to be applied to the evidence; (3) the trial court committed reversible error in denying defendant the right to open and close the penalty phase arguments; (4) the trial court committed reversible error in denying defendant's request for allocution during the penalty phase of his capital case; (5) the trial court committed reversible constitutional error by failing to require the State to disclose the aggravating circumstances on which it intended to rely at sentencing; (6) the trial court committed reversible error by instructing jurors to decide whether nonstatutory mitigating circumstances have mitigating value; (7) the trial court committed reversible error in allowing death-qualification of the jury by excusing for cause certain jurors who expressed an unwillingness to impose the death penalty, as this process created a conviction-prone jury and denied defendant a fair trial; (8) the trial court committed reversible error by its use of the term "may" in sentencing issues Three and Four, thereby making consideration of proven mitigation discretionary with the sentencing jurors; (9) the trial court committed reversible error in its penalty phase instructions, which allowed each juror in deciding Issues Three and Four to consider only the mitigation found by that juror at Issue Two, thereby limiting the full and free consideration of mitigation required by the state and federal Constitutions; and (10) the North Carolina death penalty statute is unconstitutional. Defendant makes these arguments to allow this Court to reexamine its prior holdings and to preserve these issues for any possible further judicial review. We have thoroughly considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, these assignments of error are overruled.

## PROPORTIONALITY REVIEW

[12] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentence of death was based; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury found one aggravating circumstance: defendant had previously been convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3).

Two statutory mitigating circumstances were submitted for the jury's consideration: (1) the capital felony was committed while the defendant was under the influence of emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (2) the catchall mitigating circumstance that there existed any other circumstance arising from the evidence which the jury deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9). Of these statutory mitigating circumstances, the jury found only (f)(2) to exist. Of the eight nonstatutory mitigating circumstances submitted by the trial court, one or more jurors found the following: that defendant had feelings of abandonment by his parents and was raised by his grandparents.

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstance found by the jury. Further, there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We turn now to our final statutory duty of proportionality review.

The purpose of proportionality review is to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also acts "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield*, 298

N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting our proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death sentence disproportionate in seven cases: *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by Gaines,* 345 N.C. 647, 483 S.E.2d 396, *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted of first-degree murder on the basis of premeditation and deliberation. We have repeatedly recognized that "a finding of premeditation and deliberation indicates 'a more calculated and cold-blooded crime.'" *State v. Harris,* 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee,* 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied,* 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied,* 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Here, the jury also found the (e)(3) aggravating circumstance based on defendant's prior murder conviction for shooting and killing his first wife. We have recognized that the jury's finding of the prior conviction of a violent felony aggravating circumstance "is significant in finding a death sentence proportionate." *Id.* None of the cases in which the death sentence was determined to be disproportionate have included this aggravating circumstance. *Id.*

We also compare the present case with cases in which this Court has found the death penalty to be proportionate. *McCollum,* 334 N.C. at 244, 433 S.E.2d at 164. Although we review all of the cases in the pool of "similar cases" when engaging in our statutorily mandated duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out the duty." *Id.; accord State v. Gregory,* 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied,* 525 U.S. 952, 142 L. Ed. 2d 315 (1998).

There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *Warren*, 347 N.C. at 328, 492 S.E.2d at 619. The (e)(3) statutory aggravating circumstance, which the jury found here, is among those four. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Therefore, we conclude that the present case is more similar to cases in which we have found the sentence of death proportionate than to those in which we have found it disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, based upon the characteristics of this defendant and the crime he committed, we are convinced that the sentence of death recommended by the jury and ordered by the trial court in the present case is not disproportionate.

Accordingly, we conclude defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. The sentence of death recommended by the jury and entered by the trial court must therefore be left undisturbed.

NO ERROR.