IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-92

Filed 18 April 2023

Rowan County, No. 19CRS53041

STATE OF NORTH CAROLINA

v.

TORIE EUGENE CUTHBERTSON, Defendant.

Appeal by defendant from judgment entered on or about 9 June 2021 by Judge William A. Wood II in Superior Court, Rowan County. Heard in the Court of Appeals 15 November 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Michael T. Henry, for the State.*

*Daniel M. Blau Attorney at Law, P.C., by Daniel M. Blau, for defendant-appellant.*

STROUD, Chief Judge.

Defendant Torie Eugene Cuthbertson appeals from a judgment, entered following a jury trial, for assault on a government official/employee. On appeal, Defendant argues the trial court erred in overruling his objection, under *Batson v. Kentucky*, 476 U.S. 79, 90 L.Ed.2d 69 (1986), to the prosecutor peremptorily striking two Black jurors. Specifically, Defendant contends: (1) the trial court did not sufficiently explain its ruling so we must remand, and (2) the trial court erred in concluding the prosecutor's strikes were not motivated by discriminatory intent so we

should grant him a new trial. Because the trial court adequately considered all the relevant factors presented by the parties when ruling on Defendant's objection, we do not need to remand the case. Further, because the trial court did not clearly err, based on all the relevant factors and circumstances, in determining the prosecutor's strikes of the two Black jurors were not motivated in substantial part by discriminatory intent, we find no error.

## I. Background

Although the sole issue on appeal relates to Defendant's *Batson* objection during jury selection, we recount the facts of the case because the role of race in the case is a pertinent factor in our *Batson* analysis. *See State v. Bennett*, 282 N.C. App. 585, 609, 871 S.E.2d 831, 849 (2022) [hereinafter *Bennett III*], *appeal dismissed and disc. rev. denied*, ___ N.C. ___, 881 S.E.2d 305 (2022). At trial, the State's evidence tended to show on the night of 20 July 2019, Defendant, who is Black, pulled into the parking lot of a bar on his motorcycle, which was playing "loud" music. After their captain alerted them to the loud music coming from the motorcycle, two police officers on patrol behind the bar—at least one of whom was White[1]—approached Defendant and gave "numerous commands" to turn off the music. Defendant ignored the officers' commands. Instead, Defendant got off his motorcycle and "jumped up on" a three-to-four-foot retaining wall that separated the bar's patio from the parking lot. The

---

[1] The record only contains information about the race of the police officer who was the alleged victim of the assault that led to the charge here.

officers made "numerous attempts" to have Defendant get off the wall and speak with them about a noise ordinance violation, but Defendant "continued to chill out by talking over" the officers. At that time, the officers decided to arrest Defendant "for resist, obstruct, delay due to him not providing any type of identification" and not speaking with them about the motorcycle and its loud music.

To initiate the arrest, one of the officers—the one whom the record reveals is White—tried to grab Defendant's arm "to pull him off the wall[,]" but Defendant jumped off the top of the wall to the other side from the officers. The officer followed Defendant to the other side of the wall and continued to try to grab Defendant's arms to handcuff him. At that point, Defendant took his motorcycle helmet, which he was still holding in his hand, and "swung up" towards the officer "slightly striking [him] in the face on the lower jaw." A later check-up by emergency medical services revealed "[n]o major injuries[;]"the officer only had a "sore lip" and lacked "obvious signs of any injuries."

After the officer was hit, Defendant and the officer continued "to tussle" until the second officer came around the wall, pulled out his taser, and radioed for backup. During this tussle, the motorcycle helmet "fell on the ground[.]" As the second officer arrived at the tussle, the officer who was hit "push[ed] away" from Defendant, and Defendant "backed away" to sit down in a patio chair. Defendant then asked the officers "what was going on" before he returned to conversing with other patrons at

the bar. A "few moments" later, the officers' backup arrived, and they arrested Defendant without further incident.

The same day as the incident, Defendant was charged, in relevant part, with misdemeanor assault on a government official/ employee ("assault").[2] On or about 25 July 2019, Defendant was found guilty of the assault in District Court. Defendant then appealed the District Court judgment to Superior Court. *See* N.C. Gen. Stat. § 15A-1431(b) (2019) ("A defendant convicted in the district court before the judge may appeal to the superior court for trial de novo with a jury as provided by law.").

The case came for trial in Superior Court starting on 7 June 2021. Because this appeal involves an issue arising out of jury selection, we recount that process before discussing the trial.[3] The initial jury pool, which included all the jurors the prosecutor peremptorily struck, included 25 prospective jurors; four were Black, and the remaining 21 were White. After 2 prospective jurors, 1 of whom was Black, were

---

[2] Defendant was also charged with misdemeanor possession of drug paraphernalia, but he was found not guilty on that charge in District Court before the Superior Court trial that led to the instant appeal. Because the drug paraphernalia charge does not relate to the instant appeal, we do not further discuss it.

[3] The *Batson* hearing before the trial court was the only relevant part of jury selection that was transcribed; *voir dire* of the jurors was not transcribed. In place of a transcript of the jury selection, the record contains a document entitled "Statement Regarding Jury Selection" that provides a narrative about jury selection. (Capitalization altered.) This narrative of jury *voir dire* is permissible under Rule of Appellate Procedure 9(c)(1). *See* N.C. R. App. P. 9(c)(1) (requiring *voir dire* to "be set out in narrative form except where such form might not fairly reflect the true sense of the evidence received"); N.C. R. App. P. 9(c)(2) (allowing an appellant to use a transcript of *voir dire* "in lieu of narrating the evidence and other trial proceedings as permitted by Rule 9(c)(1)" when *voir dire* "proceedings are the basis for one or more issues presented on appeal"). As a result, we use the "Statement Regarding Jury Selection" to supplement the transcribed *Batson* hearing.

struck for cause, the 12 prospective jurors in the box included 10 White people and 2 Black people, H.M. and D.N.[4] The prosecutor then used peremptory strikes against only H.M. and D.N., and Defendant's attorney made a *Batson* challenge to those strikes. As a result, the trial court held a *Batson* hearing.

The trial court began the *Batson* hearing by confirming both H.M. and D.N. were Black. Then, the trial court confirmed on the record Defendant is Black and the police officer in the case, who was set to be the State's only witness, is White. The trial court also determined Defendant's attorney did not have historical evidence of discrimination by either the county district attorney's office or the specific prosecutor in the case. The trial court next asked Defendant's attorney if there had been any disparate questioning or a pattern of striking Black jurors. While Defendant's attorney said there was no disparate questioning, he argued there was a pattern because the prosecutor struck the only two Black jurors in the jury box during his first chance to exercise peremptory strikes. Finally at this initial part of the *Batson* hearing, the trial court asked if Defendant's attorney had "any other relevant circumstances" to place on the record, and Defendant's attorney only added his "client has a constitutional right to a jury of his peers." Based on this evidence, the trial court found "there [was] an inference from the totality of relevant facts that

---

[4] We use the jurors' initials throughout to protect their identity because they were struck in part due to criminal charges and convictions. *See Bennett III*, 282 N.C. App. at 586 n.1, 871 S.E.2d at 836 n.1 (also using prospective jurors' initials in *Batson* appeal because they were struck due to past criminal activity).

impermissible discrimination ha[d] occurred" and asked the prosecutor to give "race-neutral justifications" for the peremptory strikes.

The prosecutor gave similar reasons for striking H.M. and D.N. As to H.M., the prosecutor first said H.M. had failed to disclose a "very lengthy criminal history" when the prosecutor asked if anyone had ever been convicted of a crime. The prosecutor also said he did not think H.M. could "apply the law to the facts at the end of this case and make a fair and impartial decision" because H.M. said he "just really didn't want to do it" when asked "about his ability to be fair and impartial[.]" Similarly, the prosecutor first said he struck D.N. because she failed to disclose a "Class 1 driving charge" in response to his question about if anyone had been charged with a crime. Additionally, the prosecutor recalled D.N. said she "didn't know if she could be fair and impartial[,]" and he "believe[d] based on that answer she could not be[.]"

After the prosecutor gave his reasons, the trial court asked if the prosecutor checked the criminal records "for both the White and Black jurors[,]" and the prosecutor responded he had checked the record for "every single person in this jury pool[.]" Defendant's attorney initially declined to present additional argument after hearing the prosecutor's reasons, but he then disputed the prosecutor's characterization of H.M.'s statements and argued the prosecutor had successfully rehabilitated both H.M. and D.N. on the issue of whether they could be fair and

impartial. Defendant's attorney did not present any argument on the criminal histories of either H.M. or D.N.

Following the arguments by the parties, the trial court denied the *Batson* challenges and allowed the prosecutor's peremptory strikes of H.M. and D.N. to stand. As to H.M., the trial court explained:

> Well, the court with regard to [H.M.] has weighed the questions and answers, comparisons between the other jurors, and finds that the prosecutor's asked the same questions of each of the jurors and the questions given -- excuse me, the answers given by [H.M.] can be distinguished from the answers of the other jurors, and that [H.M.] had, in fact, been convicted of a crime and done eight months where the other jurors, none of which the ones that the prosecutor accepted and did not exercise a challenge on indicated they'd been convicted of a crime to the best of my knowledge.
>
> Also, [H.M.], according to the prosecutor which is uncontroverted, has a lengthy criminal history going back years including a felony conviction. So with regard to [H.M.], the court is going to find that the prosecutor's exercise of his preemptory challenge was not motivated by discriminatory intent.

As to D.N., the trial court ruled:

> With regard to [D.N.], she was not forthcoming about the driving charge. Once again, the prosecutor has run the records of all the jurors. There was no other juror other than perhaps [H.M.], who was not forthcoming to our knowledge about criminal history. Additionally, it is the court's recollection that she indicated she probably couldn't be fair or she didn't know if she could be fair is a more accurate way of putting what she said on the record.
>
> The court's going to find with regard to [D.N.] in light of all the relevant facts and circumstances that the court has before it, that the prosecutor's exercise of that

preemptory challenge was not motivated by discriminatory
intent.

Throughout the remainder of jury selection, the prosecutor did not use any additional peremptory strikes. The jury seated for trial ultimately contained 11 White jurors and 1 Black juror;[5] the Black juror was the only Black prospective juror from the initial pool not excused for cause or struck by the prosecution.

At trial, the State's sole witness was the officer who was struck by the motorcycle helmet. The officer testified about the incident with Defendant at the bar. As part of the testimony, the State admitted into evidence footage of the incident from the body cameras of both the officer who was struck and the second officer who was present for the whole incident. The defense also called the officer as a witness to have him further testify about a portion of the other officer's body camera footage.

Defendant was the only other witness at trial. Beyond testifying he turned down the music from his motorcycle, Defendant explained his actions during the incident. First, Defendant, who is Black, testified when the officers, at least one of whom is White, approached him he stood on the retaining wall so people in the patio area could "see what was going on up there[;]" he wanted to "have witnesses in case anything did happen." Defendant then explained he did not follow the officers' commands to come closer because they were standing on the other side of the wall from the patio area and he was concerned they were trying to "lure" him "behind that

---

[5] No alternate jurors were selected.

wall so nobody could see" them. Specifically, Defendant was concerned the officers "were going to harm" him based on language they had used like "'Get you're A down'" and "'If you don't get off of there, I'm going to take you off of that[.]'" Further, Defendant testified he did not know why the officer tried to grab him because he "didn't do anything wrong[.]" Finally, Defendant denied swinging his helmet at the officer or resisting arrest. Defendant said his helmet did not make contact with the officer that he "kn[e]w of" and any contact "was not intentional if it did" happen.

The jury convicted Defendant on the assault charge. On or about 9 June 2021, the trial court sentenced Defendant to 120 days imprisonment. Defendant entered notice of appeal in open court.

## II. Analysis

On appeal, Defendant's sole argument is that "the trial court erred by allowing the State to use peremptory challenges against prospective jurors [H.M.] and [D.N.], in violation of the Fourteenth Amendment to the United States Constitution and Article I, Sections 19 and 26 of the North Carolina Constitution." (Capitalization altered.) "The use of peremptory challenges for racially discriminatory reasons violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *State v. Locklear*, 349 N.C. 118, 136, 505 S.E.2d 277, 287 (1998) (citing *Batson*, 476 U.S. at 86, 90 L.Ed.2d at 80). "The North Carolina Constitution, Article I, Section 26, also prohibits the exercise of peremptory strikes solely on the basis of race." *Id.* Finally, Article I, Section 19 of our Constitution also includes a

guarantee of "equal protection of the laws[.]" N.C. Const., Art. I, Section 19 ("No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin.").

For all three of the constitutional grounds Defendant raises, our Courts use the same test laid out by the Supreme Court of the United States in *Batson* to "analyze claims of racially motivated peremptory strikes[.]" *See State v. Clegg*, 380 N.C. 127, 142-45, 867 S.E.2d 885, 898-900 (2022) (discussing the history of *Batson* before stating our Courts have "adopted the *Batson* test for review of peremptory challenges under the North Carolina Constitution"); *State v. Waring*, 364 N.C. 443, 474-75, 701 S.E.2d 615, 635-36 (2010) (explaining the *Batson* test after stating, "Our review of race-based . . . discrimination during petit jury selection has been the same under both the Fourteenth Amendment to the United States Constitution and Article 1, Section 26 of the North Carolina Constitution"); *State v. Davis*, 325 N.C. 607, 617-20, 386 S.E.2d 418, 422-24 (1989) (analyzing under *Batson*'s test when the defendant argued the prosecution used its peremptory strikes in a racially discriminatory manner in violation of, *inter alia*, the Fourteenth Amendment to the Constitution of the United States and Article I, Sections 19 and 26 of our Constitution). Under *Batson*, a court determines whether a prosecutor improperly exercised a peremptory challenge based on race with a three-step inquiry:

> First, the party raising the claim must make a prima facie

showing of intentional discrimination under the totality of the relevant facts in the case. Second, if a prima facie case is established, the burden shifts to the State to present a race-neutral explanation for the challenge. Finally, the trial court must then determine whether the defendant has met the burden of proving purposeful discrimination.

*State v. Bennett*, 374 N.C. 579, 592, 843 S.E.2d 222, 231 (2020) [hereinafter *Bennett II*].

Within *Batson*'s three-step inquiry, Defendant only challenges the trial court's ruling at the third step that the prosecution's peremptory strikes of H.M. and D.N. were "not motivated by discriminatory intent" and argues we should grant him a new trial as a result. In the alternative, Defendant contends "the Trial Court did not sufficiently explain how it weighed the relevant factors" at the third step, so we should remand for the trial court to "reconsider its analysis" and "make further findings of fact and conclusions of law." After explaining the standard of review, we first discuss the remand issue because if the trial court failed to sufficiently explain its ruling, we cannot fully review its ruling.

## A. Standard of Review

This Court has recently explained the standard of review for *Batson* as follows:

When reviewing a trial court's *Batson* analysis, "a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder v. Louisiana*, 552 U.S. 472, 477, 128 S. Ct. 1203, 1207, 170 L.Ed.2d 175[, 181] (2008); *State v. Clegg*, [380 N.C. 127, 145], 867 S.E.2d 885[, 900 (2022)] (quoting same language from *Snyder*). "Such 'clear error' is deemed to exist when, on the entire evidence[,] the Court is left with the definite

- 11 -

and firm conviction that a mistake has been committed." *Clegg*, [380 N.C. at 141, 867 S.E.2d at 897] (quoting *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231) (alteration in original). This deferential standard reflects that "[a] trial court's rulings regarding race-neutrality and purposeful discrimination are largely based on evaluations of credibility . . . ." *State v. King*, 353 N.C. 457, 469–70, 546 S.E.2d 575, 586–87 (2001). As our courts have recognized before, trial courts are "in the best position to assess the prosecutor's credibility . . . ." *State v. Cummings*, 346 N.C. 291, 309, 488 S.E.2d 550, 561 (1997); *see also Hernandez v. New York*, 500 U.S. 352, 365, 111 S. Ct. 1859, 1869, 114 L.Ed.2d 395[, 409] (1991) (explaining "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province" (quotations and citation omitted)).

Under the clearly erroneous standard, "[t]he trial court's findings will be upheld on appeal unless the 'reviewing court on the entire evidence [would be] left with the definite and firm conviction that a mistake ha[d] been committed.' " *State v. Chapman*, 359 N.C. 328, 339, 611 S.E.2d 794, 806 (2005) (quoting *Hernandez*, 500 U.S. at 369, 111 S. Ct. at 1871[, 114 L.Ed.2d at 412]) (alterations in original). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *King*, 353 N.C. at 470, 546 S.E.2d at 587 (quotations and citations omitted); *see also Hernandez*, 500 U.S. at 369, 111 S. Ct. at 1871[, 114 L.Ed.2d at 412] (including identical language). This deference, however, "does not by definition preclude relief." *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231 (quoting *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L.Ed.2d 196[, 214] (2005)).

*Bennett III*, 282 N.C. App. at 600-01, 871 S.E.2d at 843-44 (brackets relating to citation information added) (ellipses and all other brackets in original).

## B. Remand Issue

Examining the remand issue first, Defendant contends "the Trial Court did not sufficiently explain how it weighed the relevant factors" at *Batson*'s third step, so we should remand for the trial court to "reconsider its analysis" and "make further findings of fact and conclusions of law." At *Batson*'s third step, the trial court must "determine whether the defendant has met the burden of proving purposeful discrimination" is what motivated the prosecutor's peremptory strike. *Id.* at 607, 871 S.E.2d at 848 (quoting *Bennett II*, 374 N.C. at 592, 843 S.E.2d at 231). In making this determination, the trial court acts like a scale. *See Clegg*, 380 N.C. at 149-50, 867 S.E.2d at 903 (explaining "a common judicial analogy" that "conceptualiz[es]" *Batson* using a scale). After both the defendant and the prosecutor have placed their reasons on the scale as part of *Batson*'s first two steps, the trial court "carefully weighs all of the reasoning from both sides to ultimately decide whether it was more likely than not that the challenge was improperly motivated." *Id.* (citation, quotation marks, and brackets omitted).

To help weigh the reasoning from both sides, trial courts "employ an open-ended list of factors." *Bennett III*, 282 N.C. App. at 607, 871 S.E.2d at 848. The open-ended list of relevant factors includes:

- statistical evidence about the prosecutor's use of peremptory strikes against Black prospective jurors as compared to white prospective jurors in the case;
- evidence of a prosecutor's disparate questioning and investigation of Black and white prospective jurors in the

case;
- side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck in the case;
- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
- [the susceptibility of the particular case to racial discrimination;[6]]
- relevant history of the State's peremptory strikes in past cases; or
- other relevant circumstances that bear upon the issue of racial discrimination.

*Bennett III*, 282 N.C. App. at 608-609, 871 S.E.2d at 848-49 (quoting *State v. Hobbs*, 374 N.C. 345, 356, 841 S.E.2d 492, 501 (2020) (in turn citing *Flowers v. Mississippi*, ___ U.S. ___, ___, 204 L.Ed.2d 638, 655-56 (2019))) (brackets from original omitted and own information in brackets added); *see also State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 150 (1990).

Defendant argues the trial court failed to properly weigh all of these factors at *Batson*'s third step. Specifically, Defendant contends the trial court only mentioned the prosecutor's reasons for striking H.M. and D.N. and failed to discuss "how it had weighed the other myriad relevant factors[.]" In support of this argument, Defendant cites three cases: *Hobbs*; *State v. Alexander*, 274 N.C. App. 31, 851 S.E.2d 411 (2020); and *State v. Hood*, 273 N.C. App. 348, 848 S.E.2d 515 (2020).

---

[6] This factor comes from *State v. Porter* and is included in the list from *Bennett III* to be concise. *See State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 150 (1990) (including "the susceptibility of the particular case to racial discrimination" as a factor for courts to consider (citations and quotation marks omitted)).

In *Hobbs*, our Supreme Court remanded because the trial court "misapplied the *Batson* analysis" in relevant part by failing to properly take into account all the third stage factors the defendant had presented to it. *Hobbs*, 374 N.C. at 358-59, 841 S.E.2d at 502-03. In particular, our Supreme Court noted "the trial court did not explain how it weighed the totality of the circumstances surrounding the prosecution's use of peremptory challenges, *including the historical evidence that [the defendant] brought to the trial court's attention."* *Id.* at 358, 841 S.E.2d at 502 (emphasis added). Additionally, the Supreme Court did not know "how or whether" the trial court evaluated comparisons between the answers of struck Black prospective jurors and White prospective jurors acceptable to the State that the defendant "*sought to bring to the court's attention."* *Id.* at 358-59, 841 S.E.2d at 502-03 (emphasis added). The Supreme Court's discussion of this Court's error in *Hobbs* further emphasizes the importance of taking into account all the evidence presented by a defendant. *See id.* at 359, 841 S.E.2d at 503. Specifically, the Supreme Court said this Court committed a "[s]imilar legal error" as the trial court and then explained this Court "failed to weigh all the evidence put on by [the defendant.]" *Id.* Finally, in responding to a dissenting opinion, the Supreme Court explained its ruling was animated by a preexisting requirement for "a court to consider all of the evidence before it when determining whether to sustain or overrule a *Batson* challenge." *Id.* at 358, 841 S.E.2d at 502. Thus, the error that required remand in *Hobbs* was the

trial court's failure to weigh all the evidence presented by the defendant at *Batson*'s third step. *See id.* at 358-59, 841 S.E.2d at 502-03.

Both *Alexander* and *Hood* similarly required remand because the trial court failed to explain how it weighed all the evidence the defendant presented. *See Alexander*, 274 N.C. App. at 43-44, 851 S.E.2d at 419-20; *Hood*, 273 N.C. App. at 357, 848 S.E.2d at 522. In *Alexander*, this Court noted the trial court erred by failing to address one of the defendant's argument and not making clear if it took into account a comparison between White and Black prospective jurors raised by the defendant. *See Alexander*, 274 N.C. App. at 43-44, 851 S.E.2d at 419-20. The *Alexander* Court's remand instructions further reinforced the need to address the defendant's argument when they directed the trial court to "make specific findings as to all the pertinent evidence and arguments" and then explain how it "weighed the totality of the circumstances." *Id.* at 47, 851 S.E.2d at 422 (citation and quotation marks omitted). Similarly in *Hood*, this Court found the trial court erred "in failing to make the requisite findings of fact and conclusions of law *addressing the evidence presented by counsel*" when it "summarily denied" the defendant's *Batson* challenge. *Hood*, 273 N.C. App. at 357, 848 S.E.2d at 522. Thus, *Hobbs*, *Alexander*, and *Hood* all stand for the proposition that an appellate court must remand when, at step three of the *Batson* inquiry, the trial court has failed to consider and address all the evidence and arguments raised by a defendant's attorney. *See Hobbs*, 374 N.C. at 358-59, 841

S.E.2d at 502-03; *Alexander*, 274 N.C. App. at 43-44, 851 S.E.2d at 419-20; *Hood*, 273 N.C. App. at 375, 848 S.E.2d at 522.

Returning to the scale analogy, *see Clegg*, 380 N.C. at 149-50, 867 S.E.2d at 903, an appellate court must remand when the trial court failed to include on the scale all the arguments presented to it by the parties. If the trial court failed to include all the presented factors on the scale, the reviewing court necessarily cannot determine if the trial court properly weighed all the factors. *See id.* at 144, 867 S.E.2d at 900 (explaining a reviewing court determines if "all of the relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike of one [B]lack prospective juror was not motivated in substantial part by discriminatory intent" (quoting *Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 664) (ellipses and brackets omitted)).

Here, unlike in *Hobbs*, *Alexander*, and *Hood*, the trial court placed all the factors presented to it by the parties on the scale, and thus we do not need to remand. *See Hobbs*, 374 N.C. at 358-59, 841 S.E.2d at 502-03; *Alexander*, 274 N.C. App. at 43-44, 851 S.E.2d at 419-20; *Hood*, 273 N.C. App. at 375, 848 S.E.2d at 522. We first recount all the factors the parties placed on the scale before explaining how the trial court addressed all of them.

At the start of the *Batson* hearing, Defendant's attorney said he was making the *Batson* challenge because the prosecutor had struck the only 2 Black jurors during the first chance he had to use peremptory strikes. In other words, Defendant's

attorney raised the fact that the prosecutor had struck all the Black prospective jurors and none of the White prospective jurors. When the trial court subsequently asked Defendant's attorney if there were "any other relevant circumstances [he]'d like to get on the record[,]" Defendant's attorney just responded that his "client has a constitutional right to a jury of his peers[,]" which is the motivation behind *Batson* rather than a factor in the *Batson* analysis. *See Batson*, 476 U.S. at 85, 90 L.Ed.2d at 80-81 (explaining the impetus for "eradicat[ing] racial discrimination" in jury selection comes from the idea "that the State denies a [B]lack defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded").

The prosecutor then gave his two reasons for excluding each juror: (1) their failures to disclose their "criminal history" and (2) the prosecutor's concerns about the prospective jurors' abilities to be "fair and impartial[.]" After the prosecutor gave his reasons for the strikes, the trial court asked Defendant's attorney again if he had "[a]ny other argument[,]" and Defendant's attorney raised two additional points relevant to those reasons. First, in regard only to H.M., Defendant's attorney said he would "characterize [H.M.]'s statements" about the ability to be fair and impartial "differently[.]" Second, with respect to both H.M. and D.N., Defendant's attorney argued the prosecutor successfully rehabilitated the jurors on the issue of whether they could be fair and impartial. The parties did not present any other arguments, so those arguments represent everything the trial court needed to weigh on the scales.

*See Hobbs*, 374 N.C. at 358-59, 841 S.E.2d at 502-03; *Alexander*, 274 N.C. App. at 43-44, 851 S.E.2d at 419-20; *Hood*, 273 N.C. App. at 375, 848 S.E.2d at 522.

The trial court properly reviewed and weighed all of those factors and relevant pieces of evidence. Defendant does not dispute the trial court properly accounted for the prosecutor's reasons. On the other side of the scale, Defendant's attorney presented the following for weighing by the trial court: statistics about strike rate; a challenge to the prosecutor's "characteriz[ation]" of H.M.'s statements on being fair and impartial; and an argument the prosecutor had successfully rehabilitated the jurors on the issue of whether they could be fair and impartial.

From the record before us, we can determine the trial court weighed each of those factors in reaching its decision. As to the statistics on strike rate, the trial court took them into account at *Batson*'s first step, which is where they were initially presented, because it found a *prima facie* case of discrimination based on that fact and after determining the race of all the relevant people. Having considered the strike rate evidence at the first step, we see no reason, and Defendant presents none, why the trial court would not have considered the strike rate at the third step when it said it was ruling "in light of all the relevant facts and circumstances that the court has before it[.]" As to the characterization of H.M.'s answers to the question about whether he could be fair and impartial and Defendant's argument the prosecutor rehabilitated H.M. on the subject, the trial court did not mention H.M.'s ability to be fair and impartial when analyzing H.M.'s strike after Defendant's attorney raised the

mischaracterization argument. The trial court's lack of reliance on that reason implies the trial court agreed with Defendant's overarching point that the strike could not be justified based on H.M.'s answer, whether for the reasons Defendant put forth or another reason. Either way, because the trial court did not rely on that part of the prosecutor's reasoning in making its final ruling, it did not need to address Defendant's rebuttal against that reasoning. Finally, as to Defendant's argument the prosecutor rehabilitated D.N. on the subject of whether she could be fair or impartial, we first note that dispute is ultimately a question of fact rather than a legal factor that needs to be weighed. More importantly, the trial court addressed Defendant's argument when it gave its own recollection of D.N.'s answers that aligned with the prosecutor's explanation because that recollection showed the trial court was convinced by the prosecutor's reasoning and not by Defendant's rehabilitation argument. Thus, the trial court weighed all the relevant factors presented by the parties in its *Batson* step three ruling.

The trial court's decision to inquire about and take into account additional factors not argued by Defendant's trial counsel further reinforces our conclusion that the trial court adequately weighed the relevant factors at *Batson*'s third step. First, beyond inquiring about the races of H.M. and D.N., the trial court asked about the race of Defendant and the law enforcement officer who was a witness in this case, which is relevant to the factor based on "the susceptibility of the particular case to racial discrimination[.]" *See Bennett III*, 282 N.C. App. at 621, 871 S.E.2d at 856

(explaining this factor looks at whether the race of "the defendant, the victims, and the key witnesses" cross "racial lines" (citation and quotation marks omitted)). The trial court also inquired about historical evidence of discrimination by the district attorney's office in general or the prosecutor conducting *voir dire* in particular, but there was none. *See id.* at 608-09, 871 S.E.2d at 848-49 (stating "relevant history of the State's peremptory strikes in past cases" can be considered at *Batson*'s third step).

Turning to the trial court's ruling, it found the prosecutor "asked the same questions of each of the jurors and . . . the answers given by [H.M] can be distinguished from the answers of the other jurors[.]" The trial court similarly concluded D.N.'s undisclosed criminal record set her apart from other prospective jurors. In making those determinations, it is clear the trial court independently decided to consider two other relevant factors, evidence of a disparate investigation or lack thereof in the trial court's determination and side-by-side comparisons of jurors. *See id.* (listing those two factors as considerations at the third step of *Batson*). The trial court's independent decision to assess these factors, even though they were not presented by either party, is further proof it understood it needed to and did in fact weigh all the relevant factors in the *Batson* step three analysis.

Since the trial court adequately accounted for all the factors presented to it at *Batson*'s third step, we do not need to remand. We therefore reject Defendant's argument about the need to remand and proceed to review Defendant's argument about whether the trial court erred in ruling against him on *Batson*'s third step.

## C. *Batson* Step Three

Defendant primarily argues on appeal that the trial court "commit[ted] clear error" at *Batson*'s third step "by finding that the prosecutor's strikes were not racially motivated." As explained above, at the third step, the trial court uses the following open-ended list of factors to "determine whether the defendant has met the burden of proving purposeful discrimination" is what motivated the prosecutor's peremptory strike:

- statistical evidence about the prosecutor's use of peremptory strikes against Black prospective jurors as compared to white prospective jurors in the case;
- evidence of a prosecutor's disparate questioning and investigation of Black and white prospective jurors in the case;
- side-by-side comparisons of Black prospective jurors who were struck and white prospective jurors who were not struck in the case;
- a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
- [the susceptibility of the particular case to racial discrimination;]
- relevant history of the State's peremptory strikes in past cases; or
- other relevant circumstances that bear upon the issue of racial discrimination.

*Bennett III*, 282 N.C. App. at 607-09, 871 S.E.2d at 848-49; *see also Porter*, 326 N.C. at 498, 391 S.E.2d at 150 (including "the susceptibility of the particular case to racial discrimination" as a factor for courts to consider).

On appeal, the reviewing court examines the relevant factors from the open-ended list to determine if "all of the relevant facts and circumstances taken together

establish that the trial court committed clear error in concluding that the State's peremptory strike of one [B]lack prospective juror was not motivated in substantial part by discriminatory intent." *Clegg*, 380 N.C. at 144, 867 S.E.2d at 900 (quoting *Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 664) (ellipses and brackets from original omitted and own brackets added). We review each of the relevant circumstances in this case.

### 1. *Statistical Evidence of Strike and Acceptance Rates*

First, we consider "statistical evidence about the prosecutor's use of peremptory strikes against Black prospective jurors as compared to white prospective jurors in the case[.]" *Bennett III*, 282 N.C. App. at 608, 871 S.E.2d at 848-49. Here, the relevant part of the jury pool included 25 prospective jurors, and 4 of the prospective jurors were Black while the remaining 21 prospective jurors were White.[7] After 1 of the Black prospective jurors was excused for cause, the State used 2 peremptory strikes on H.M. and D.N., which led to the *Batson* objection, hearing, and ruling at issue in this appeal. Once the trial court allowed the strikes of H.M. and D.N., the fourth Black prospective juror was sat in the jury box, and the prosecutor did not use a peremptory challenge against him or any other juror for the remainder

---

[7] All of the State's peremptory strikes were used on members of this initial pool of 25 prospective jurors, so it is this initial pool of prospective jurors on which we focus when considering statistical evidence on strike rates. *See Bennett III*, 282 N.C. App. at 608, 871 S.E.2d at 848-49 (explaining the statistical evidence is about "the *prosecutor's* use of peremptory strikes" (emphasis added)). Later in jury selection, 30 additional prospective jurors were brought in, but no Black prospective juror from this pool made it into the jury box, and the State did not use any peremptory strikes on this pool. As a result, those additional prospective jurors do not impact the strike and acceptance rates.

of jury selection. Notably, the prosecutor did not ever use a peremptory strike against a White prospective juror.

As a result, in line with Defendant's argument, the relevant statistics of the prosecutor's use of peremptory strikes are as follows: The State used 100% of its peremptory strikes against Black jurors. Because the State used all of its peremptory strikes against Black jurors, it correspondingly struck 0% of White prospective jurors. The State also peremptorily struck 67% of the Black jurors who could have been peremptorily struck. Further, the 1 Black prospective juror the State did not peremptorily strike only came into the jury box *after* the *Batson* objection and hearing. Traditionally a decision to accept a single Black juror in the face of otherwise one-sided statistics is viewed "skeptically[.]" *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 659 (explaining a decision to allow one Black juror when five others were struck was evidence in favor of a determination "the State was motivated in substantial part by discriminatory intent" because the Supreme Court of the United States has "skeptically viewed the State's decision to accept one [B]lack juror" when striking others); *Miller-El II*, 545 U.S. at 250, 162 L.Ed.2d at 220 (explaining a "late-stage decision to accept a [B]lack panel member" did not "neutralize the early-stage decision to challenge a comparable venireman").

This statistical evidence favors a finding of purposeful discrimination. *See, e.g., Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 659 (explaining the decision to strike five of six Black prospective jurors was evidence in favor of a determination "the State

was motivated in substantial part by discriminatory intent"). But we note "bare statistics" are not as powerful as some of the other factors we examine at this step. *See Miller-El II*, 545 U.S. at 241, 162 L.Ed.2d at 214 (explaining "side-by-side comparisons" of struck Black prospective jurors to White prospective jurors "allowed to serve" are "[m]ore powerful than the[] bare statistics"). Thus, while the statistical evidence weighs in Defendant's favor, it is only part of our inquiry.

The State makes two arguments about why we should reject the evidence of strike and acceptance rates, but neither argument changes how we weigh the statistical evidence. First, the State contends, without supporting authority, Defendant "never argued such calculations to the trial court." This argument does not comport with the record. While Defendant's attorney did not give specific percentages, he told the trial court there was a "pattern" of striking Black jurors because the prosecutor struck H.M. and D.N. at the first opportunity and no other Black jurors were in the jury box at the time. With this discussion, Defendant's attorney made clear that, at the time of the *Batson* hearing, the prosecution had struck 100% of Black jurors.

In its second argument about rejecting the evidence of strike and acceptance rates, the State asserts the rates "arise from the numerical happenstance common to small sample sizes." This argument does not persuade us to outright reject the strike and acceptance rates evidence because our Supreme Court has considered such strike and acceptance rate evidence before in a case with a similarly small sample size. This

case has a typical "sample size" as compared to other *Batson* cases. In *Clegg*, our Supreme Court explained the trial court "acted properly in considering [the] defendant's statistical evidence regarding the disproportionate use of peremptory strikes against Black potential jurors" where the initial pool included 22 potential jurors and 2 of the 3 people of color in that pool were ultimately struck by the prosecutor. *Clegg*, 380 N.C. at 151-52, 156, 867 S.E.2d at 904-05, 907. Those statistics are remarkably similar to the statistics here where the initial juror pool that contained all of the prosecutor's peremptory strikes was a group of 25 people with 4 Black prospective jurors, of whom 1 was excused for cause and 2 of the 3 remaining were peremptorily struck. Since the statistical evidence was properly considered in *Clegg*, *see id.*, it is properly considered here with a similarly small sample size. But, to the extent a small sample size could skew the strike and acceptance rate data, we reiterate precedent already indicates "bare statistics" are not as powerful as some of the other factors we examine at this stage. *See Miller-El II*, 545 U.S. at 241, 162 L.Ed.2d at 214.

### 2. *Susceptibility of the Case to Racial Discrimination*

Turning to the next factor in our inquiry, we consider the "susceptibility of the particular case to racial discrimination." *Bennett III*, 282 N.C. App. at 621, 871 S.E.2d at 856 (quoting *Porter*, 326 N.C. at 498, 391 S.E.2d at 150). "The race of the defendant, the victims, and the key witnesses bears upon this determination." *Id.* (quoting *Porter*, 326 N.C. at 498, 391 S.E.2d at 150-51). Specifically, "our courts have

focused on whether the case crosses racial lines among those key figures." *Id.* (citing *State v. Fair*, 354 N.C. 131, 142, 557 S.E.2d 500, 511 (2001); *State v. Golphin*, 352 N.C. 364, 432, 533 S.E.2d 168, 214 (2000); *Porter*, 326 N.C. at 500, 391 S.E.2d at 152).

Here, as Defendant highlights, Defendant is Black and the police officer who was allegedly assaulted and was the sole witness for the State at trial is White. Further, at trial the jury primarily had to make a credibility determination between the Black Defendant and the White police officer. The police officer testified Defendant swung his motorcycle helmet at the officer, striking him in the jaw. Conversely, Defendant testified he did not swing his motorcycle helmet at the officer and his helmet did not touch the police officer that he "kn[e]w of." The only other evidence the jury had was body camera footage, but it is not clear if this footage showed the precise moment at issue. Since the two key, and only, witnesses in this case are of different races and the jury had to make a credibility determination between them, this case is susceptible to racial discrimination in jury selection, which also favors a finding of purposeful discrimination. *See Golphin*, 352 N.C. at 432-33, 533 S.E.2d at 214-15 (discussing the susceptibility of the case to racial discrimination before stating, "[h]owever" and determining other factors that led to the conclusion the prosecution had not used its peremptory strikes in a racially discriminatory way).

### 3. *Lack of Disparate Questioning and Investigation*

A third factor in our inquiry is whether the prosecutor engaged in "disparate questioning and investigation of Black and white prospective jurors[.]" *Bennett III*,

282 N.C. App. at 608-609, 871 S.E.2d at 848-49. "[D]isparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race." *Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 660-61. While neither party argues based on this factor, we review "all of the relevant facts and circumstances[,]" *Clegg*, 380 N.C. at 144, 867 S.E.2d at 900, and the trial court inquired about and ruled in part based on this factor.

The trial court found no disparate questioning or disparate investigation. Specifically, when questioned by the trial court, Defendant's attorney agreed the prosecutor asked the same questions of the Black and White prospective jurors and also examined them in the same "manner or style[.]" As to the prosecutor's investigation, after the prosecutor explained he struck both H.M. and D.N. in part because they did not mention past criminal charges or convictions, the trial court asked the prosecutor if he had "run criminal record checks for both the White and Black jurors," and the prosecutor responded, "Yes . . . as far as I'm aware, every single person in this jury pool has had a record check." Thus, the record does not contain any evidence of disparate questioning or disparate investigation, which weighs against a finding of purposeful discrimination. *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 660-61 (explaining how disparate questioning or investigation can obscure racially discriminatory reasons for strikes).

**4. *Specific Reasons Prosecutor Gave for Striking Prospective Jurors***

Finally, we directly examine the reasons the prosecutor gave for his strikes and the arguments Defendant makes about each of the reasons. This part of the inquiry will involve multiple factors including whether the prosecutor "misrepresent[ed] . . . the record when defending the strikes during the *Batson* hearing" and comparisons between the struck Black jurors and White jurors who were not struck. *Bennett III*, 282 N.C. App. at 608-609, 871 S.E.2d at 848-49.

During the *Batson* hearing before the trial court, the prosecutor gave the same two reasons for striking both H.M. and D.N. First, the prosecutor said each prospective juror had failed to disclose their "criminal history[.]" Second, the prosecutor explained he had concerns about the prospective jurors' abilities to be "fair and impartial[.]" We review the prosecutor's reasoning for striking each individual juror in turn because the "Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499, 195 L.Ed.2d 1, 12 (2016) (quoting *Snyder*, 552 U.S. at 478, 170 L.Ed.2d at 181).

*a. Prospective Juror H.M.*

As to prospective juror H.M., the prosecutor struck him first because he failed to disclose "a very lengthy criminal history" when the prosecutor asked if anyone had "ever been convicted of a crime." This reason is facially race neutral. Further, our record contains no evidence any other prospective juror who the State did not strike similarly failed to disclose a criminal history, which would be evidence of pretext if it were to exist. *See Miller-El II*, 545 U.S. at 241, 162 L.Ed.2d at 214 ("If a prosecutor's

proffered reason for striking a [B]lack panelist applies just as well to an otherwise-similar non[B]lack [person] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

As to this first reason from the prosecutor, Defendant argues the prosecutor failed to ask "any follow-up questions to determine why [H.M.] had not disclosed the convictions, or whether he was even the same person reflected in the prosecutor's documents." Initially, we note the record does not contain any information suggesting H.M. was not the same person reflected in the prosecutor's documents and Defendant does not provide any such information or support for that contention. Turning to the failure to ask follow-up questions about the lack of disclosure, we first note the failure to follow-up can contribute to a *Batson* violation as evidence of disparate investigation. *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 662 ("A State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." (citation and quotation marks omitted)); *Bennett III*, 282 N.C. App. at 613, 871 S.E.2d at 851 (citing *Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 660-63) ("Disparate investigation and a failure to meaningfully voir dire a potential juror on a subject used later to justify a strike could be evidence an explanation is pretextual."). For example, in *Flowers*, the Supreme Court of the United States analyzed the relevance of the failure to meaningfully *voir dire* when it was discussing how the prosecution asked a Black prospective juror numerous follow-up questions

about her connections to people involved in the case but did not ask three similarly connected White jurors any follow-up questions on the subject. *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 662. The *Flowers* Court reasoned "[i]f the State were concerned about prospective jurors' connections to witnesses in the case, the State presumably would have used individual questioning to ask those potential white jurors whether they could remain impartial despite their relationships." *Id.* "Still, 'disparate questioning or investigation alone does not constitute a *Batson* violation.'" *Bennett III*, 282 N.C. App. at 613, 871 S.E.2d at 851 (citing *Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 661).

Here, while the prosecutor failed to follow-up on H.M.'s non-disclosure of his criminal history, there is no evidence this failure reflected disparate investigation or questioning. As discussed above, when the trial court inquired about the prosecutor's investigation of jurors' criminal records after he gave this reason for striking H.M, the prosecutor said he ran criminal history checks for every potential juror. Further, the record includes no indication any White juror comparably had an undisclosed criminal record. This lack of comparable juror blunts the impact of the failure to follow-up because the failure to follow-up could have been universal. This case does not have the same situation as in *Flowers* where the prosecutor's decision on whether to follow-up broke down on racial lines. *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 662. Here, the *voir dire* was not recorded, and we must rely upon the narrative summary of the questioning. *See supra* note 3. Since the record does not contain

enough information to ascertain if the failure to question broke down on racial lines, it is plausible the prosecutor's failure to follow-up "reflect[ed] ordinary race-neutral considerations." *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 661-63 (explaining disparate questioning or investigation can "reflect ordinary race-neutral considerations" before turning to a comparative juror analysis that focused on the failure follow-up with White prospective jurors on the same reasons that animated a strike of a Black prospective juror).

Faced with this plausible explanation for the prosecutor's failure to follow-up, we fall back on the nature of appellate review of *Batson* decisions. When conducting a *Batson* review, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Bennett III*, 282 N.C. App. at 601, 871 S.E.2d at 844 (citations and quotation marks omitted). The plausible view that the prosecutor's failure to follow-up was race neutral can be reconciled with the trial court's ultimate determination that the prosecutor's strike was not substantially motivated by discriminatory intent, so the failure to follow-up does not support a determination the trial court clearly erred.

Beyond H.M.'s undisclosed criminal history, the prosecutor had another valid reason for the strike. The prosecutor also struck H.M. because the prosecutor had

concerns about H.M.'s ability to be "fair and impartial[.]"[8]  Specifically, the prosecutor explained:

> when asked about his ability to be fair and impartial, he said he just really didn't want to do it. He just really didn't want to do it, didn't think he could be fair and impartial, tried to kind of pin him down that -- and I think from his answers that I don't think he could judge this, or I won't say judge, but apply the law to the facts at the end of this case and make a fair and impartial decision.

This reason is facially race neutral, but Defendant argues we should find the trial court clearly erred because "the prosecutor mischaracterized [H.M.]'s answers" on this question.  *Batson* precedent recognizes a prosecutor's misrepresentation of the record can be evidence of pretext.  *See Clegg*, 380 N.C. at 154, 867 S.E.2d at 906 (citing *Foster*, 578 U.S. at 505, 195 L.Ed.2d at 15-16) ("[P]roffered reasons that are contradicted by the record are unacceptable in supporting a challenged peremptory strike.").  But the prosecutor did not mischaracterize H.M.'s answers here.

At the outset, we note we do not have a complete transcript of the jury selection *voir dire*, so we cannot look at H.M.'s precise answers to the questions and compare them to the prosecutor's representations of H.M.'s answers.  Instead, we are left with the parties' North Carolina Rule of Appellate Procedure 9(c)(1) supplement that narrates the events of jury selection.  *See supra* note 3. Per that supplement, H.M.

---

[8] Although—as discussed above in the section on whether we needed to remand the case—the trial court appears to have rejected this argument, we can still review the reason on appeal. *See Clegg*, 380 N.C. at 154-55, 867 S.E.2d at 906 (explaining as part of its review that the trial court "properly rejected" two of the prosecutor's arguments below because of lack of support in the record).

"initially said he did not want to serve as a juror and did not know if he could be fair and impartial, but after further discussion, he said he thought that he probably could be fair."

Comparing that answer to the prosecutor's representation, the prosecutor did not mischaracterize H.M.'s answers. The only time the prosecutor represented H.M.'s answers, the prosecutor said H.M. said he did not want to "do it" and "didn't think he could be fair and impartial[.]" That corresponds closely to the supplement's narration where H.M. initially said he did not want to be a juror and "did not know if he could be fair and impartial[.]" The rest of the prosecutor's reasoning for why he struck H.M. relied not on any discussion of H.M.'s answers but rather the prosecutor's own sense that the prosecutor could not "pin [H.M.] down" on the topic and did not think H.M. could "apply the law to the facts at the end of this case and make a fair and impartial decision." While the prosecutor did not explicitly acknowledge H.M.'s statement that H.M. "thought that he probably could be fair[,]" the prosecutor's discussion of his continued concerns can easily be reconciled with H.M.'s later, still slightly equivocal answer about his ability to be fair.

At most, the differences here represent two different ways of interpreting the relevance and strength of H.M.'s second answer that he thought he could be fair and impartial. The prosecutor, based on the statement above, does not appear to have been fully convinced by that answer because he still had doubts about H.M., which could be animated by the initial answer. By contrast, Defendant's argument on

appeal, which appears to be based on the same argument Defendant's trial counsel made, is premised on the idea H.M.'s second answer rehabilitated H.M. on the issue. On appeal, Defendant argues, "Defense counsel found the prosecutor's mischaracterization significant enough to bring to the Trial Court's attention during the Batson hearing[] (T p.21)[.]" At that portion of the transcript, Defendant's trial counsel said he "would characterize [H.M.'s] statements differently" because "[i]t seemed to me that the prosecutor had rehabilitated him and he said that he probably could apply the law to -- apply the facts to the law as instructed." Thus, Defendant's argument on appeal is animated by a belief H.M.'s second answer rehabilitated the juror on the question.

A difference in belief about the quality of the prosecutor's rehabilitation of H.M. does not rise to the level of a *Batson* violation. *See Bennett III*, 282 N.C. App. at 601, 871 S.E.2d at 844. "Where there are two permissible views of the evidence," such as here, "the factfinder's choice between them cannot be clearly erroneous." *Id.* Moreover, the trial court is better-situated than this Court to evaluate the prosecutor's credibility in explaining his concerns about whether H.M. could be fair based on H.M.'s answers. *See id.* at 600, 871 S.E.2d at 844 ("As our courts have recognized before, trial courts are 'in the best position to assess the prosecutor's credibility[.]'" (quoting *Cummings*, 346 N.C. at 309, 488 S.E.2d at 561)). The trial court ultimately sided with the prosecutor by denying the *Batson* challenge. As a result, we reject Defendant's argument and do not discount the prosecutor's

explanation he struck H.M. as a result of concerns over whether H.M. could be fair and impartial due to the prosecutor's alleged mischaracterization of the record.

b. *Prospective Juror D.N.*

Turning to prospective juror D.N., the prosecutor first struck D.N. on the grounds she "was not forthcoming" about a "Class 1 driving charge that she was charged with" when he asked if "anyone had ever been charged with a crime[.]" Our record does not contain any additional information on the "Class 1 driving charge[.]" But our statutes have separate numerical "Class[es]" only for misdemeanor charges, *see generally* N.C. Gen. Stat. § 15A-1340.23 (2019) (setting out misdemeanor classes with numbers); N.C. Gen. Stat. § 15A-1340.17 (2019) (setting out felony classes with letters), and some driving offenses are Class 1 misdemeanors. *See, e.g.,* N.C. Gen. Stat. § 20-141.6(c) (2019) ("A person convicted of aggressive driving is guilty of a Class 1 misdemeanor."). As a result, it appears the prosecutor was referring to a charge for a Class 1 misdemeanor.

As Defendant concedes, the prosecutor's proffered reason for striking D.N. based on her failure to disclose this past charge is facially race neutral. Defendant presents three contentions that the prosecutor's reason was actually pretextual, but none of them convince us the trial court clearly erred in accepting this reason. First, Defendant argues the prosecutor "had asked the jurors if any of them had ever been charged with a *crime*, not a traffic offense" and "there are many Class 1 traffic misdemeanors that ordinary citizens might view as 'compliance' tickets or minor

- 36 -

offenses, rather than as 'criminal' charges that they would need to disclose in response to such a question." (Emphasis added by Defendant.) But a Class 1 misdemeanor, or any misdemeanor, is a crime. *See* N.C. Gen. Stat. § 14-1 (2019) (defining felonies and then stating, "Any other *crime* is a misdemeanor" (emphasis added)). Whether ordinary citizens may not recognize the charge as a misdemeanor crime does not undermine the prosecutor's reasoning on its own. While the failure to disclose can have an innocent explanation of failing to realize a charge was a crime, it can also be the result of a willful failure to disclose. Without additional information, the prosecutor cannot know which of the two options explains a failure to disclose.

We reject Defendant's second argument for similar reasons. Defendant contends the prosecutor was focused on charges in this question and that "fairly suggests that [D.N.] was not actually *convicted* of the offense, which would make it even less likely that she would realize that she needed to disclose it[.]" (Emphasis in original.) Even accepting Defendant's contention D.N. was likely not convicted of the offense, the prosecutor still explained that he struck D.N. because she failed to disclose the charge when the prospective jurors were asked "if any of them had ever been *charged* with a crime." (Emphasis added.) The prosecutor had also previously asked if anyone had been convicted of a crime. Since the prosecutor asked about both convictions and charges separately, D.N. could, and arguably should, have realized the need to disclose a misdemeanor charge. Even if D.N. did not realize the need to disclose the charge, the prosecutor would not necessarily know that the failure to

disclose had an innocent explanation, as already discussed.

As Defendant's third contention recognizes, one way to try to cure the uncertainty around the reason for the failure to disclose would be for the prosecutor to ask follow-up questions to determine if D.N.'s "failure to disclose" the Class 1 misdemeanor charge "was a simple misunderstanding." While in other situations the failure to follow-up can contribute to a *Batson* violation in conjunction with other factors, here the same factors that mitigated the prosecutor's failure to follow-up above with respect to H.M. exist with D.N. as well. *See Flowers*, ___ U.S. at ___, 204 L.Ed.2d at 662 (stating a failure to "meaningful[ly] voir dire" on a subject is evidence suggesting an explanation "is a sham and a pretext for discrimination"); *Bennett III*, 282 N.C. App. at 613, 871 S.E.2d at 851 (explaining disparate investigation and a lack of meaningful *voir dire* "on a subject used later to justify a strike" can be evidence "an explanation is pretextual" before stating "disparate questioning or investigation alone does not constitute a *Batson* violation"). The prosecutor checked all jurors' criminal histories. No other White juror was similarly situated, so the failure to follow-up could have been universal rather than the result of racially disparate investigation.

Moreover, as with H.M. above, the prosecutor had another valid reason to strike D.N. Specifically, the prosecutor also struck her because of a concern about whether she could be fair or impartial:

> [W]hen I got into the same questions about can you be fair

and impartial, she said probably. I kind of tried to flesh
that out with her a little. I can't remember her exact words,
but she didn't know if she could do that to another person,
didn't know if she could be fair and impartial. I did try to
ask that a few different ways, and I believe based on her
answers that she could not be, Your Honor.

This reasoning is facially race neutral. Further, the prosecutor's explanation aligns

with D.N.'s answers when asked if she could be fair and impartial. Specifically, D.N.

responded that she probably could be fair and impartial.
The prosecutor asked her to explain further, and she stated
that she did not know if she could "do that to another
person." The prosecutor told [D.N.] that, as a juror, she
would only be deciding whether the State had met its
burden of proof in the case, and would not be deciding any
issue related to punishment. [D.N.] said she might be able
to be fair and impartial, but did not know if she could.

Defendant does not even contest the accuracy of the prosecutor's representations of

D.N.'s answers. Thus, the prosecutor's facially race neutral reason also accurately

represented D.N.'s answers.

Defendant acknowledges D.N. said "at one point" that "she did not know if she

could be fair" but contends "she also initially stated that she could probably be fair."

Defendant then argues D.N. "never said that she could *not* be fair, and defense

counsel believed that the prosecutor had sufficiently rehabilitated her." As with the

arguments about H.M. above, at most Defendant's arguments here represent a

difference in opinion about how well the prosecutor rehabilitated D.N. With D.N.,

the case is even stronger against rehabilitation because her later answers revealed

more equivocality than her earlier answers, which was the opposite of H.M. Put

another way, D.N. seemed less likely to be able to be fair or impartial the more the prosecutor asked, which is the opposite of how a rehabilitation of a juror would work. Regardless of the relative strength of the rehabilitation, similar to the discussion of H.M.'s answers above, this difference in opinion about how well the prosecutor rehabilitated D.N. does not amount to a clear error in the trial court's rejection of Defendant's *Batson* challenge.

## 5. *Weighing All of the Relevant Factors*

Now that we have reviewed "all of the relevant facts and circumstances[,]" we determine that, "taken together[,]" the trial court did not commit clear error in concluding the State's peremptory strikes of H.M. and D.N. were not "motivated in substantial part by discriminatory intent." *Clegg*, 380 N.C. at 144, 867 S.E.2d at 900. The statistics of strike rates and susceptibility of the case to racial discrimination both weigh on the side of discriminatory intent, but those two factors alone are not as powerful as other factors. *See Miller-El II*, 545 U.S. at 241, 162 L.Ed.2d at 214 (explaining "bare statistics" are not as "powerful" as "side-by-side comparisons" of struck Black prospective jurors and White prospective jurors "allowed to serve"); *Golphin*, 352 N.C. at 432-33, 533 S.E.2d at 214-15 (explaining the case was "susceptible to racial discrimination" before determining the other factors meant the reviewing court was "convinced the State did not discriminate on the basis of race in exercising its peremptory challenges").

On the other side of the scale, the prosecutor did not engage in disparate

questioning or investigation. Additionally, the prosecutor gave two race-neutral reasons—(1) failure to disclose criminal history and (2) concerns about the ability to be fair and impartial—for striking each juror that withstand scrutiny. While the prosecutor did not follow-up on the prospective jurors' failure to disclose their criminal history, that lack of follow-up is mitigated by the lack of any evidence in our record indicating it was due to disparate treatment. Further, the prosecutor's concerns about H.M. and D.N.'s ability to be fair and impartial had no such caveats.

Based on this evidence, we are not "left with the definite and firm conviction that a mistake ha[s] been committed." *Bennett III*, 282 N.C. App. at 600, 871 S.E.2d at 844. As a result, we hold the trial court did not clearly err in denying Defendant's *Batson* objections. *See id.*

## III. Conclusion

The trial court did not err in denying Defendant's *Batson* challenge to the prosecutor's peremptory strikes of two Black jurors. The trial court properly considered all the relevant factors presented by the parties when it weighed the circumstances at *Batson*'s third step, so we do not need to remand this case. Turning to the trial court's ruling itself, after reviewing all the relevant factors and circumstances, the trial court did not clearly err in determining the prosecutor's peremptory strikes were not motivated in substantial part by discriminatory intent.

NO ERROR.

Judges DILLON and GORE concur.